EXHIBIT
1

# FANON RUCKER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**December 25, 2021 06:36 AM**
**FANON RUCKER**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1142484**

**3371 READING LLC** **A 2104408**

**vs.**

**LIBERTY MUTUAL GROUP INC**

## FILING TYPE: INITIAL FILING (IN COUNTY) WITH JURY DEMAND

## PAGES FILED: 57

EFR200

IN THE COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

3371 Reading, LLC,
c/o Gottesman & Associates, LLC
404 East 12th Street, First Floor
Cincinnati, Ohio 45202

Plaintiff,

v.

Liberty Mutual Group, Inc.
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215,

and

The Ohio Casualty Insurance Company,
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215

Defendant.

Case No.

Judge

COMPLAINT WITH JURY DEMAND ENDORSED HEREON

Plaintiff, by and through counsel, for its Complaint against Defendants states as follows:

**Parties**

1. Plaintiff, 3371 Reading, LLC ("Reading"), is an Ohio limited liability company that owns the real property located at 3371 Reading Road (the "Property") in Hamilton County, Ohio, and has so owned it at all times relevant to the allegations herein.

2. Defendant, Liberty Mutual Group, Inc., is a Massachusetts corporation that underwrote the coverage, insured the Property and/or adjusted the insurance claim at issue including, but not limited to, denying the claim in bad faith.



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

3. Defendant, The Ohio Casualty Insurance Company, is an Ohio corporation that underwrote the coverage, insured the Property and/or adjusted the insurance claim at issue including, but not limited to, denying the claim in bad faith.

**Jurisdiction & Venue**

4. Venue is proper in this Court pursuant to Civ. R. 3(c) because the Defendants conducted activity that gave rise to the claims for relief in this county and the Property that is the subject of this action is located in this county.

5. This Court has personal jurisdiction over the Defendants pursuant to R.C. §2307.382 because they transacted business in Ohio, and they caused tortious injury in Ohio.

6. This Court has subject matter jurisdiction over this action pursuant to R.C. § 2305.01.

**Facts**

7. The Property, which contained a vacant building, was acquired by Reading on May 4, 2020. In anticipation of renovating the building, Reading obtained an Inland Marine Insurance Policy with Builders' Risk coverage (Policy No. BMO 62480292) (the "Policy") through Camargo Insurance Company, Inc., ("Camargo"). Camargo is an insurance agency with which Reading had a longstanding relationship, and which had procured numerous similar policies from Defendants and on behalf of entities associated with Reading.

8. One or both Defendants underwrote and issued the Policy to Reading for full coverage on the value of the Property. A true and accurate copy of the Policy is attached as Exhibit 1 and incorporated herein by reference.

9. The Property contained a building comprised of vacant apartments. The building contained four walls, one of which was a common wall, and all such walls exceeded

six feet in height. During non-working hours, the building, which was the jobsite, was locked and secured.

10. The building on the Property extended to the property line on 3 sides. The building was abutted on the south side by another building, on the east side by a public sidewalk, and on the north side by a property owned by a third-party. As a result, it was not possible to put a fence (if the walls of the building itself did not constitute a "fence") around the building.

11. On August 6, 2021, when the Policy was in full force and effect, but not during work hours, there was a fire at the Property that completely destroyed the building. Neither Reading nor its agents had anything to do with causing the fire, and there is no evidence the fire was due to arson.

12. The Cincinnati Fire Department did a cause and origin investigation that was inconclusive. The cause and origin of the fire remain undetermined. The building was a total loss, and it has been razed with the permission of the City of Cincinnati

13 Pursuant to certain terms and conditions of the Policy, Reading timely submitted to Defendants a properly supported claim for its loss and fully cooperated with every proper request made to it by Defendants.

14. From June of 2019 through the date of loss, Camargo, on behalf of various entities related to Reading, applied to Defendants for policies of Inland Marine Insurance Coverage, including Builders' Risk Coverage, approximately 22 times.

15. Out of 22 policies, the Policy (Policy No. BMO62480292) was the only policy to include the "Protective Devices Schedule" and "Protective Devices Endorsement"

improperly relied upon by Defendants as their stated basis for denying coverage in this instance.

16. When Camargo applied for these policies online, neither the "Protective Device Schedule" nor the "Protective Devices Endorsement" were even available as endorsements under the "Mandatory Forms" or "Optional Forms" input menus. The clearly established course of dealing was not to include the "Protective Devices Schedule" and "Protective Devices Endorsement" in a policy obtained by Camargo. Instead, Defendants' underwriter, Jonathan Jones, added these provisions without any request by either Camargo or Reading.

17. There was nothing in the online application process that asked about the presence of, or even the possibility of installing, fencing around the building and/or the jobsite. Instead, the online application included one simple question: "Please describe the security measures at insured's yard and jobsites"; to which Camargo responded: "Building Secured".

18. This is crucial because had the issue been raised during the underwriting process, which Defendants entirely controlled, Camargo, on behalf of Reading, would have informed Defendants that the building and/or jobsite could not be fenced (except by the four walls of the building itself). As explained above, the insured building was abutted on the south side by another building, on the east side by a public sidewalk, and on the north side by property owned by a third party. This rendered it impossible to erect "a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated," except, again, for the four walls of the building itself. These physical characteristics of the building would have been immediately discovered through the most basic

underwriting process, which Defendants failed to do, if they merely had looked at the building on Google maps.

19. The specific language of the Policy upon which Defendants rely in this case is set forth in two separate portions of the Policy. The first portion is the Protective Devices Schedule which provides:

**IM 7904 04 04 Protective Devices Schedule**

AAIS
IM 7904 04 04
Page 1 0f 1

This endorsement changes
the Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

---

PROTECTIVEDEVICES SCHEDULE

---

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours

IM 7904 04 04 Copyright, American Association of Insurance Services, Inc. 2004

And the second is the "Protective Devices Endorsement" which provides:

**IM 7853 04 04 Protective Devices Endorsement**

AAIS
IM 7853 04 04

This endorsement changes
the Inland Marine Coverage
- PLEASE READ IT CAREFULLY -

PROTECTIVEDEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

---

OTHER CONDITIONS

---

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

---

PERILS EXCLUDED

---

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

20. Reading submitted a claim for the full limit of the proceeds of the Policy to the Defendants. Reading fully cooperated in Defendants' investigation.

21. Defendants conducted a hurried investigation of the claim. So hurried, their agents failed to determine that fencing around the building/jobsite was an impossibility. Then, Defendants wrongfully and without reasonable justification denied coverage for the loss on the basis that "No fencing was placed around the jobsite as required by the Protective Devices Endorsement on the policy." See the correspondence attached hereto as Exhibit 2 and incorporated herein by reference.

22. On Oct. 22, 2021, Reading, through counsel, sent a letter to Defendants explaining in detail how Defendants' wrongful denial of Reading's claim had no reasonable basis in law or in fact, and was otherwise improper and in bad faith, because Defendants' coverage analysis was legally and factually unsupported. See the correspondence attached hereto as Exhibit 3 and incorporated herein by reference. In an effort at mitigating its damages, Reading also made it clear in the letter that since the date of the fire, it already suffered additional damages due to Defendants' bad faith denial and that it would continue to suffer such damages unless Defendants timely reconsidered their bad faith denial.

23. With full knowledge of what was at stake, Defendants then took an unreasonable amount of time to respond to Reading, finally doing so on Nov. 23, 2021. Defendants' response, conveyed in an email by Attorney Bill Harter of Frost, Brown Todd, LLC., as agent and representative for Defendants, continued to deny coverage for the loss despite the total lack of any reasonable legal or factual justification for the denial. Specifically, in Attorney Harter's email, Defendants raised irrelevant facts but utterly failed

to address the points of law, facts and arguments laid out in the Oct. 22, 2021, letter. See the Harter email attached hereto as Exhibit 4 and incorporated herein by reference.

24. Attorney Harter had been hired by Defendants to look into Defendants' bad faith denial of coverage and, at Defendants' request, became Reading's point of contact with Defendants for this claim. Attorney Harter, as agent and representative for Defendants, further contributed to Defendants' bad faith acts by unreasonably failing to respond to phone calls and correspondence in a timely fashion, and otherwise intentionally failing to address the legal and factual arguments contained in the Oct. 22, 2021, letter. These, and all of the above actions by or on behalf of Defendants were done with full knowledge of the damage accruing to Reading, and done deliberately with the intent of forcing Reading to litigate in Court or abandon its claim.

25. Attorney Bill Harter is a material witness to the facts underlying Reading's claims set forth herein.

26. Defendants continue in their refusal to pay Reading's claim despite a clear legal duty to do so.

27. As a direct and proximate result of Defendants' tortious and bad faith refusal to pay Reading's claim for the loss at the Property, Reading has suffered, is suffering and will suffer in the future consequential and special damages in the form of lost business, loss rental income, loss of investor revenue and related profits, and other damages to be proven at trial.

28. Even if the specific endorsements relied upon by Defendants actually applied to the facts of this loss, Defendants' reliance on terms and/or exclusions requiring fencing surrounding the building/jobsite rendered illusory any coverage provided by the Policy. As

such, the contract at issue should be reformed due to mutual mistake of fact, to eliminate the problematic endorsements.

**First Cause of Action – Breach of Contract/Reformation**

29. Reading incorporates the preceding allegations by reference.

30. The Policy provides: "If indicated on the Protective Devices Schedule, the following conditions apply to the locations on the schedule." The above-quoted language is taken directly and verbatim from the "Protective Devices Endorsement". To the Insured, and anyone else reading the above language, the word "schedule" at the end of the sentence would be understood to refer to the "Protective Devices Schedule" referenced at the beginning of the sentence. However, there are no "locations" listed, indicated, or referenced on the "Protective Devices Schedule". Therefore, there is no good faith basis to say that the "Protective Devices Endorsement" applies to the facts of this loss, and such endorsement must otherwise be strictly construed against Defendants.

31. The Policy also provides: "Protective Devices – 'You' are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule." Again, the above-quoted language is taken directly and verbatim from the "Protective Devices Endorsement." Defendants chose not to define the word "maintain". However, to the insured, and anyone else reading the above language, the word "maintain" is both clear and unambiguous in requiring an insured to maintain only that which already is in place. In fact, the Merriam-Webster dictionary definition of the word "maintain" is "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline, maintain machinery." Specifically, it does not mean "to place or erect or install" in the first instance. Therefore, even if Defendants' alleged interpretation of this

language is a reasonable interpretation, this language must be construed strictly against Defendants, who chose this language, to only include fencing that was present at the time the Policy was applied for (which is to say, no fencing at all in the present matter).

32. The impossibility of erecting a fence as required by the "Protective Devices Schedule" renders the Policy illusory. No loss by theft or fire would ever be covered by the Policy as issued because the Insured could never comply with the Defendants' interpretation of the "Protective Devices Schedule" and "Protective Devices Endorsement". An insurance provision is illusory when it appears to grant a benefit to the insured, although in reality, it does not. *Coleman v. Progressive Preferred Ins. Co.*, 1st Dist. No. C-070779, 2008 Ohio 3568, P13; *GenCorp., Inc. v. AIU Ins. Co.*, 104 F.Supp.2d 740, 745 (N.D. Ohio 2000). Courts are not inclined to give insurance provisions a meaning that would render them illusory. *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007 Ohio 2722, P133, 873 N.E.2d 345; *Talbert v. Continental Cas. Co.*, 157 Ohio App. 3d 469, 2004 Ohio 2608, 811 N.E.2d 1169. Thus, the terms/exclusions at issue that Defendants rely upon must be reformed so as to require coverage.

33. In this case, Defendants made no effort to prove or establish how the presence of a fence would have prevented the loss at issue, nor can they. The cause of the fire is undetermined. As the party claiming an exclusion applies, Defendants must have some basis for claiming the presence of a fence surrounding the jobsite would have prevented the loss, or that the lack of a fence played some role in causing the loss. See *Praetorian Ins. Co. v. Axia Contr., LLC*, 794 Fed. Appx. 791 (10th Cir., 2019). (Court held the carrier could not rely on the "Protective Devices Schedule" and the "Protective Devices Endorsement" to avoid coverage

after a fire where there was no evidence the insured's failure to maintain fencing caused or contributed to the loss.).

34. The denial of coverage was predicated on Defendants' definition of the term "fence" to mean a structure or device separate and apart from the building walls themselves. But, the actual terms of the policy merely contained the following language: "fence, not less than six (6) feet height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours." Defendants chose not to define their use of the term "fence" in the Policy. A dictionary definition of the term "fence," means "a barrier intended to prevent escape or intrusion or to mark a boundary."[1] And the term "gate" to mean "an opening in a wall or fence." The fact that the building itself was enclosed by four walls, all more than six feet in height, all enclosing the jobsite, all secured and locked, fulfills the meaning of the term Defendants chose to employ. And, to the extent that Defendants intended any other meaning, the law is clear that these ambiguities are construed against the insurer and strictly in favor of the insured. *Bowling*, 149 Ohio App. 3d 290.

35. As a consequence of the foregoing, Defendants issued and underwrote the Policy, either directly or as the Policy should be reformed due to mutual mistake; Reading fully performed all acts required to trigger insurance coverage, including the timely payment of premiums, the timely presentment of a claim, notice to the insurer of the loss, and all other conditions precedent to the payment of the claim; Defendants breached this Policy, and Reading has been harmed thereby in an amount exceeding $25,000 to be proved at trial.

**Second Cause of Action – Bad Faith**

[1] https://dictionary.findlaw.com/definition/fence.html

36. Reading incorporates the preceding allegations by reference.

37. Defendant's refusal to pay Reading's claim for the total loss of the structure and renovations at the Property and/or Defendants' handling of the claim is tortious bad faith because Defendants' acts and/or omissions complained of herein are not predicated upon circumstances that furnished reasonable justification therefore. Rather, Defendants' acts and/or omissions complained of herein are predicated upon circumstances constituting malice, fraud or insult, making Defendants liable for punitive damages, consequential damages and attorney fees.

38. Further, and/or in the alternative, Defendants failed, and continue to fail, to exercise good faith in the processing of Reading's claim, where their refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.

39. As a direct and proximate result of Defendants' bad faith, Reading is suffering ongoing economic losses in an amount to be proven at trial in excess of $25,000.

40. Defendants' actions herein constituted fraud and/or actual malice, as that term has been defined, warranting the imposition of punitive damages and attorney fees.

WHEREFORE, Reading demands judgment against Defendants, jointly and severally, for compensatory, special, consequential, and punitive damages, attorney's fees, costs of this action, and such other relief as this Court deems just.

Respectfully submitted,

*/s/Zachary Gottesman*
Zachary Gottesman (0058675)
Trial Attorney for Plaintiff
Gottesman & Associates, LLC
404 East 12th Street, First Floor
Cincinnati, Ohio 45202
513/651-2121
zg@zgottesmanlaw.com

*/s/ Thomas B. Bruns*
Thomas B. Bruns (KBA #84985)
Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com

*/s/ Christopher Wiest*
Christopher Wiest (KBA 90725)
Chris Wiest, Atty at Law, PLLC
25 Town Center Blvd, Suite 104
Crestview Hills, KY 41017
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com

**Jury Demand**

The Plaintiff demands a trial by jury on all issues so triable.

*/s/Zachary Gottesman*
Zachary Gottesman (0058675)

**34 1448**

**BMO**
**62480292**
**12/11/2021**

**CAMARGO INSURANCE AGENCY INC**

**615 ELSINORE PL STE 310**
**CINCINNATI, OH 45202-1475**

62480292 007400 560

We strive to produce a quality product for our agents to deliver to the policyholder. In doing so, we ask that you assist us by taking time to review the enclosed policy accuracy. If there are any modifications that need to be made, we request that you return this letter to the Business Center outlining what is in error.

Named Insured: 3371 READING LLC

Corrections needed to be made on this policy (This form is not for routine change requests):

Thank you for your assistance.

Please send to: *Liberty Mutual Insurance*

**ATTENTION: C.S.I. UNIT**

1 of 24

CAU:

N O N E

This page intentionally left blank.

Liberty Mutual INSURANCE

# Policyholder Information

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| 3371 READING LLC<br>24 E UNIVERSITY AVE OFC<br>CINCINNATI<br>CINCINNATI, OH 45219 | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC<br>615 ELSINORE PL STE 310<br>CINCINNATI, OH 45202-1475 |

62480292 007400 560 3 of 24

THIS IS NOT A BILL

## *Dear Policyholder:*

Your Commercial Documents

We know you work hard to build your business. We work together with your agent,
**CAMARGO INSURANCE AGENCY INC (513) 561-5311**
to help protect the things you care about. Thank you for selecting us.

Enclosed are your insurance documents consisting of:

- Commercial Inland Marine

To find your specific coverages, limits of liability, and premium, please refer to your Declarations page(s).

If you have any questions or changes that may affect your insurance needs, please contact your Agent at (513) 561-5311

**Reminders**

- Verify that all information is correct
- If you have any changes, please contact your Agent at (513) 561-5311
- In case of a claim, call your Agent or 1-844-325-2467

## You Need To Know

- **CONTINUED ON NEXT PAGE**

***To report a claim, call your Agent or 1-844-325-2467***

**DS 70 20 01 08**

## You Need To Know - continued

- **NOTICE(S) TO POLICYHOLDER(S)**
  The Important Notice(s) to Policyholder(s) provide a general explanation of changes in coverage to your policy. The Important Notice(s) to Policyholder(s) is not a part of your insurance policy and it does not alter policy provisions or conditions. Only the provisions of your policy determine the scope of your insurance protection. It is important that you read your policy carefully to determine your rights, duties and what is and is not covered.

| FORM NUMBER | TITLE |
|---|---|
| CNI90 11 07 18 | Reporting A Commercial Claim 24 Hours A Day |
| NP 72 42 02 20 | Terrorism Insurance Premium Disclosure And Opportunity To Reject |
| NP 74 44 09 06 | U.S. Treasury Department's Office of Foreign Assets Control (OFAC) Advisory Notice to Policyholders |
| NP 89 69 11 10 | Important Policyholder Information Concerning Billing Practices |
| SNI04 01 01 20 | Liberty Mutual Group California Privacy Notice |

- This policy will be direct billed. You may choose to combine any number of policies on one bill with your billing account. Please contact your agent for more information.

# REPORTING A COMMERCIAL CLAIM 24 HOURS A DAY

**Liberty Mutual Insurance claims professionals across the United States are ready to resolve your claim quickly and fairly, so you and your team can focus on your business. Our claims teams are specialized, experienced and dedicated to a high standard of service.**

**We're Just a Call Away - One Phone Number to Report All Commercial Insurance Claims**

Reporting a new claim has never been easier. A Liberty Mutual customer service representative is available to you 24/7 at 1(844)325-2467 for reporting new property, auto, liability and workers' compensation claims. With contact centers strategically located throughout the country for continuity and accessibility, we're there when we're needed!

62480292 007400 560

**Additional Resource for Workers' Compensation Customers**

In many states, employers are required by law to use state-specific workers compensation claims forms and posting notices. This type of information can be found in the Policyholders Toolkit section of our website along with other helpful resources such as:

- Direct links to state workers compensation websites where you can find state-specific claim forms
- Assistance finding local medical providers
- First Fill pharmacy forms - part of our managed care pharmacy program committed to helping injured workers recover and return to work

Our Policyholder Toolkit can be accessed at **www.libertymutualgroup.com/toolkit.**

For all claims inquiries please call us at 1(844)325-2467 .

5 of 24

© 2018 Liberty Mutual Insurance

This page intentionally left blank.

12/14/20

3371 READING LLC

BMO (21) 62 48 02 92
From 12/11/2020 To 12/11/2021

24 E UNIVERSITY AVE OFC
CINCINNATI, OH 45219

(513) 561-5311
CAMARGO INSURANCE AGENCY INC

615 ELSINORE PL STE 310
CINCINNATI, OH 45202-1475

62480292 007400 560 7 of 24

## TERRORISM INSURANCE PREMIUM DISCLOSURE AND OPPORTUNITY TO REJECT

**This notice contains important information about the Terrorism Risk Insurance Act and its effect on your policy. Please read it carefully.**

**THE TERRORISM RISK INSURANCE ACT**

The Terrorism Risk Insurance Act, including all amendments ("TRIA" or the "Act"), establishes a program to spread the risk of catastrophic losses from certain acts of terrorism between insurers and the federal government. If an individual insurer's losses from "certified acts of terrorism" exceed a specified deductible amount, the government will generally reimburse the insurer for a percentage of losses (the "Federal Share") paid in excess of the deductible, but only if aggregate industry losses from such acts exceed the "Program Trigger". An insurer that has met its insurer deductible is not liable for any portion of losses in excess of $100 billion per year. Similarly, the federal government is not liable for any losses covered by the Act that exceed this amount. If aggregate insured losses exceed $100 billion, losses up to that amount may be pro-rated, as determined by the Secretary of the Treasury.

Beginning in calendar year 2020, the Federal Share is 80% and the Program Trigger is $200,000,000.

**MANDATORY OFFER OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM" AND DISCLOSURE OF PREMIUM**

TRIA requires insurers to make coverage available for any loss that occurs within the United States (or outside of the U.S. in the case of U.S. missions and certain air carriers and vessels), results from a "certified act of terrorism" AND that is otherwise covered under your policy.

A "certified act of terrorism" means:

> [A]ny act that is certified by the Secretary [of the Treasury], in consultation with the Secretary of Homeland Security, and the Attorney General of the United States

**(i)** to be an act of terrorism;

**(ii)** to be a violent act or an act that is dangerous to
- **(I)** human life;
- **(II)** property; or
- **(III)** infrastructure;

**(iii)** to have resulted in damage within the United States, or outside of the United States in the case of
- **(I)** an air carrier (as defined in section 40102 of title 49, United States Code) or United States flag vessel (or a vessel based principally in the United States, on which United States income tax is paid and whose insurance coverage is subject to regulation in the United States); or
- **(II)** the premises of a United States mission; and

**(iv)** to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

**REJECTING TERRORISM INSURANCE COVERAGE - WHAT YOU MUST DO**

We have included in your policy coverage for losses resulting from "certified acts of terrorism" as defined above.

THE PREMIUM CHARGE FOR THIS COVERAGE APPEARS ON THE DECLARATIONS PAGE OF THE POLICY AND DOES NOT INCLUDE ANY CHARGES FOR THE PORTION OF LOSS COVERED BY THE FEDERAL GOVERNMENT UNDER THE ACT. If we are providing you with a quote, the premium charge will also appear on your quote as a separate line item charge.

IF YOU CHOOSE TO REJECT THIS COVERAGE, PLEASE CHECK THE BOX BELOW, SIGN THE ACKNOWLEDGMENT, AND RETURN THIS FORM TO YOUR AGENT: **Please ensure any rejection is received within thirty (30) days of the effective date of your policy**.

Before making a decision to reject terrorism insurance, refer to the Disclaimer for Standard Fire Policy States located at the end of this Notice.

☐ I hereby reject this offer of coverage. I understand that by rejecting this offer, I will have no coverage for losses arising from "certified acts of terrorism" and my policy will be endorsed accordingly.

| Policyholder/Applicant's Signature | Print Name | Date Signed |
|---|---|---|
| ______________________ | ______________________ | ______________________ |

Named Insured

3371 READING LLC

Policy Number

BMO (21) 62 48 02 92

Policy Effective/Expiration Date

From 12/11/2020 To 12/11/2021

**IF YOU REJECTED THIS COVERAGE, PLEASE RETURN THIS FORM TO YOUR AGENT.**

Note: Certain states (currently CA, GA, IA, IL, ME, MO, NY, NC, NJ, OR, RI, WA, WI and WV) mandate coverage for loss caused by fire following a "certified act of terrorism" in certain types of insurance policies. If you reject TRIA coverage in these states on those policies, you will not be charged any additional premium for that state mandated coverage.

**The summary of the Act and the coverage under your policy contained in this notice is necessarily general in nature. Your policy contains specific terms, definitions, exclusions and conditions. In case of any conflict, your policy language will control the resolution of all coverage questions. Please read your policy carefully.**

If you have any questions regarding this notice, please contact your agent.

62480292 007400 560 9 of 24

# U.S. TREASURY DEPARTMENT'S OFFICE OF FOREIGN ASSETS CONTROL ("OFAC") ADVISORY NOTICE TO POLICYHOLDERS

No coverage is provided by this Policyholder Notice nor can it be construed to replace any provisions of your policy. You should read your policy and review your Declarations page for complete information on the coverages you are provided.

This Notice provides information concerning possible impact on your insurance coverage due to directives issued by OFAC. **Please read this Notice carefully.**

Please refer any questions you may have to your insurance agent.

The Office of Foreign Assets Control (OFAC) administers and enforces sanctions policy, based on Presidential declarations of "national emergency". OFAC has identified and listed numerous:

- Foreign agents;
- Front organizations;
- Terrorists;
- Terrorist organizations; and
- Narcotics traffickers;

as "Specially Designated Nationals and Blocked Persons". This list can be located on the United States Treasury's web site - http//www.treas.gov/ofac.

In accordance with OFAC regulations, if it is determined that you or any other insured, or any person or entity claiming the benefits of this insurance has violated U.S. sanctions law or is a Specially Designated National and Blocked Person, as identified by OFAC, this insurance will be considered a blocked or frozen contract and all provisions of this insurance are immediately subject to OFAC. When an insurance policy is considered to be such a blocked or frozen contract, no payments nor premium refunds may be made without authorization from OFAC. Other limitations on the premiums and payments also apply.

© 2011 Liberty Mutual Insurance. All rights reserved.
Includes copyrighted material of Insurance Services Office, Inc., with its permission.

E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

# IMPORTANT POLICYHOLDER INFORMATION CONCERNING BILLING PRACTICES

**Dear Valued Policyholder:** This insert provides you with important information about our policy billing practices that may affect you. Please review it carefully and contact your agent if you have any questions.

**Premium Notice:** We will mail you a policy Premium Notice separately. The Premium Notice will provide you with specifics regarding your agent, the account and policy billed, the billing company, payment plan, policy number, transaction dates, description of transactions, charges/credits, policy amount balance, minimum amount, and payment due date. This insert explains fees that may apply to and be shown on your Premium Notice.

**Available Premium Payment Plans:**

- **Annual Payment Plan:** When this plan applies, you have elected to pay the entire premium amount balance shown on your Premium Notice in full. No installment billing fee applies when the Annual Payment Plan applies.
- **Installment Payment Plan:** When this plan applies, you have elected to pay your policy premium in installments (e.g.: quarterly or monthly installments - Installment Payment Plans vary by state). As noted below, an installment fee may apply when the Installment Payment Plan applies.

The Premium Payment Plan that applies to your policy is shown on the top of your Premium Notice. Please contact your agent if you want to change your Payment Plan election.

**Installment Payment Plan Fee:** If you elected to pay your premiums in installments using the Installment Premium Payment Plan, an installment billing fee applies to each installment bill. The installment billing charge will not apply, however, if you pay the entire balance due when you receive the bill for the first installment. Because the amount of the installment charge varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Dishonored Payment Fee:** Your financial institution may refuse to honor the premium payment withdrawal request you submit to us due to insufficient funds in your account or for some other reason. If that is the case, and your premium payment withdrawal request is returned to us dishonored, a payment return fee will apply. Because the amount of the return fee varies from state to state, please consult your Premium Notice for the actual fee that applies.

**Late Payment Fee:** If we do not receive the minimum amount due on or before the date or time the payment is due, as indicated on your Premium Notice, you will receive a policy cancellation notice effective at a future date that will also reflect a late payment fee charge. Issuance of the cancellation notice due to non-payment of a scheduled installment(s) may result in the billing and collection of all or part of any outstanding premiums due for the policy period. Late Payment Fees vary from state to state and are not applicable in some states.

**Special Note:** Please note that some states do not permit the charging of certain fees. Therefore, if your state does not allow the charging of an Installment Payment Plan, Dishonored Payment or Late Payment Fee, the disallowed fee will not be charged and will not be included on your Premium Notice.

**EFT-Automatic Withdrawals Payment Option:** When you select this option, you will not be sent Premium Notices and, in most cases, will not be charged installment fees. For more information on our EFT-Automatic Withdrawals payment option, refer to the attached policyholder plan notice and enrollment sheet.

Once again, please contact your agent if you have any questions about the above billing practice information.

**Thank you for selecting us to service your insurance needs.**



 © 2010 Liberty Mutual Insurance Company. All rights reserved. 

# LIBERTY MUTUAL GROUP CALIFORNIA PRIVACY NOTICE

Commercial Lines (excluding Workers' Compensation)
(Effective January 1, 2020)

62480292 007400 560 11 of 24

Liberty Mutual Group and its affiliates, subsidiaries, and partners (collectively "Liberty Mutual" or "we", "us" and "our") provide insurance to companies and other insurers. This Privacy Notice explains how we gather, use, and share your data. This Privacy Notice applies to you if you are a **Liberty Mutual commercial line insured or are a commercial line claimant residing in California**. It does not apply to covered employees or claimants under Workers' Compensation policies. If this notice does not apply to you, go to libertymutual.com/privacy to review the applicable Liberty Mutual privacy notice.

**What Data Does Liberty Mutual Gather?**

We may collect the following categories of data:

- **Identifiers**, including a real name, alias, postal address, unique personal identifier, online identifier, Internet Protocol address, email address, account name, Social Security Number, driver's license number, or other similar identifiers;
- **Personal information described in California Civil Code 1798.80(e)**, such as your name, signature, Social Security Number, physical characteristics or description, address, telephone number, driver's license or state identification card number, insurance policy number, education, employment, employment history, bank account number, financial information, medical information, or health insurance information;
- **Protected classification characteristics**, including age, race, color, national origin, citizenship, religion or creed, marital status, medical condition, physical or mental disability, sex (including gender, gender identity, gender expression, pregnancy or childbirth and related medical conditions), sexual orientation, or veteran or military status;
- **Commercial information**, including records of personal property, products or services purchased, obtained, or considered, or other purchasing or consuming histories and tendencies;
- **Internet or other similar network activity**, including browsing history, search history, information on a consumer's interaction with a website, application, or advertisement;
- **Professional or employment related information**, including current or past job history or performance evaluations;
- **Inferences drawn from other personal information**, such as a profile reflecting a person's preferences, characteristics, psychological trends, predispositions, behavior, attitudes, intelligence, abilities, and aptitudes;
- **Risk data**, including data about your driving and/or accident history; this may include data from consumer reporting agencies, such as your motor vehicle records and loss history information, health data, or criminal convictions; and
- **Claims data**, including data about your previous and current claims, which may include data regarding your health, criminal convictions, third party reports, or other personal data.

For information about the types of personal data we have collected about California consumers in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**How We Get the Personal Data:**

| We gather your personal data **directly from you**. For example, you provide us with data when you: | We also gather your personal data **from other people**. For example: |
|---|---|
| • ask about, buy insurance or file a claim | • your insurance agent or broker |
| • pay your policy | • your employer, association or business (if you are insured through them) |

| | |
|---|---|
| ● visit our websites, call us, or visit our office | ● our affiliates or other insurance companies about your transactions with them |
| | ● consumer reporting agencies, Motor Vehicle Departments, and inspection services, to gather your credit history, driving record, claims history, or value and condition of your property |
| | ● other public directories and sources |
| | ● third parties, including other insurers, brokers and insurance support organizations who you have communicated with about your policy or claim, anti-fraud databases, sanctions lists, court judgments and other databases, government agencies, open electoral register or in the event of a claim, third parties including other parties to the claim witnesses, expert loss adjustors and claim handlers |
| | ● other third parties who take out a policy with us and are required to provide your data such as when you are named as a beneficiary or where a family member has taken out a policy which requires your personal data |

For information about how we have collected personal data in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

**How Does Liberty Mutual Use My Data?**

Liberty Mutual uses your data to provide you with our products and services, and as otherwise provided in this Privacy Notice. Your data may be used to:

| **Business Purpose** | **Data Categories** |
|---|---|
| **Market, sell and provide insurance.** This includes for example:<br>● calculating your premium;<br>● determining your eligibility for a quote;<br>● confirming your identity and service your policy; | ● Identifiers<br>● Personal Information<br>● Protected Classification Characteristics<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information<br>● Risk data<br>● Claims data |
| **Manage your claim.** This includes, for example:<br>● managing your claim, if any;<br>● conducting claims investigations;<br>● conducting medical examinations;<br>● conducting inspections, appraisals;<br>● providing roadside assistance;<br>● providing rental car replacement, or repairs; | ● Identifiers<br>● Personal Information<br>● Protected Classification Characteristics<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information |


© 2019 Liberty Mutual Insurance

62480292 007400 560 13 of 24

| | |
|---|---|
| | • Risk data<br>• Claims data |
| **Day to Day Business and Insurance Operations.** This includes, for example:<br>• creating, maintaining, customizing and securing accounts;<br>• supporting day-to-day business and insurance related functions;<br>• doing internal research for technology<br>• development;<br>• marketing and creating products and services;<br>• conducting audits related to a current contact with a consumer and other transactions;<br>• as described at or before the point of gathering personal data or with your authorization; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Security and Fraud Detection.** This includes for example:<br>• detecting security issues;<br>• protecting against fraud or illegal activity, and to comply with regulatory and law enforcement authorities;<br>• managing risk and securing our systems, assets, infrastructure and premises; roadside assistance, rental car replacement, or repairs<br>• help to ensure the safety and security of Liberty staff, assets and resources, which may include physical and virtual access controls and access rights management;<br>• supervisory controls and other monitoring and reviews, as permitted by law; and emergency and business continuity management; | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |
| **Regulatory and Legal Requirements.** This includes for example:<br>• controls and access rights management;<br>• to evaluate or conduct a merger, divestiture, restructuring, reorganization, dissolution, or other sale or transfer of some or all of<br>• Liberty's assets, whether as a going concern or as part of bankruptcy, liquidation, or similar proceeding, in which personal data held by Liberty is among the assets transferred;<br>• exercising and defending our legal rights and positions;<br>• to meet Liberty contract obligations;<br>• to respond to law enforcement requests and as required by applicable law, court order, or governmental regulations;<br>• as otherwise permitted by law | • Identifiers<br>• Personal Information<br>• Protected Classification Characteristics<br>• Commercial Information<br>• Internet or other similar network activity<br>• Professional or employment related information<br>• Inferences drawn from other personal information<br>• Risk data<br>• Claims data |

| | |
|---|---|
| **Improve Your Customer Experience and Our Products.** This includes for example:<br>● improve your customer experience, our products and service;<br>● to provide, support, personalize and develop our website, products and services;<br>● create and offer new products and services; | ● Identifiers<br>● Personal Information<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information<br>● Risk data<br>● Claims data |
| **Analytics to identify, understand and manage our risks and products.** This includes for example:<br>● conducting analytics to better identify, understand and manage risk and our products; | ● Identifiers<br>● Personal Information<br>● Protected Classification Characteristics<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information<br>● Risk data<br>● Claims data |
| **Customer service and technical support.** This includes for example:<br>● answer questions and provide notifications;<br>● provide customer and technical support; | ● Identifiers<br>● Personal Information<br>● Commercial Information<br>● Internet or other similar network activity<br>● Professional or employment related information<br>● Inferences drawn from other personal information<br>● Risk data<br>● Claims data |

**How Does Liberty Mutual Share My Data?**

Liberty Mutual does not sell your personal data as defined by the California Consumer Privacy Act.

Liberty Mutual shares personal data of California consumers with the following categories of third parties:

- Liberty Mutual affiliates;
- Service Providers;
- Public entities and institutions (e.g. regulatory, quasi-regulatory, tax or other authorities, law enforcement agencies, courts, arbitrational bodies, and fraud prevention agencies);
- Professional advisors including law firms, accountants, auditors, and tax advisors;
- Insurers, re-insurers, policy holders, and claimants; and
- As permitted by law.

Liberty Mutual shares the following categories of personal data regarding California consumers to service providers for business purposes:

Identifiers
Protected Classification Characteristics;
Internet or other similar network activity;
Inferences drawn from other personal information;
Professional, employment, and education information;
Personal Data;
Commercial Information;
Claims Data;
Risk Data;

For information about how we have shared personal information in the past twelve (12) months, please go to libertymutual.com/privacy and click on the link for the California Supplemental Privacy Policy.

## What Privacy Rights Do I Have?

The California Consumer Privacy Act provides California residents with specific rights regarding personal information. These rights are subject to certain exceptions. Our response may be limited as permitted under law.

### Access or Deletion

You may have the right to request that Liberty Mutual disclose certain information to you about our collection and use of your personal data in the twelve (12) months preceding such request, including a copy of the personal data we have collected. You also may have the right to request that Liberty Mutual delete personal data that Liberty Mutual collected from you, subject to certain exceptions.

Specifically, you have the right to request that we disclose the following to you, in each case for the twelve (12) month period preceding your request:

- the categories of personal data we have collected about you;
- the categories of sources from which the personal data was/is collected;
- our business or commercial purpose for collecting personal data;
- the categories of third parties with whom we share personal data;
- the specific pieces of data we have collected about you;
- the categories of personal data about you, if any, that we have disclosed for monetary or other valuable consideration, including the categories of third parties to which we have disclosed the data, by category or categories of personal data for each third party to which we disclosed the personal data; and
- the categories of personal data about you that we disclosed for a business purpose.

**You can make a request by either:**

Calling: 800-344-0197

Online: libertymutualgroup.com/privacy-policy/data- request

Mail: Attn: Privacy Office
Liberty Mutual Insurance Company
175 Berkeley St., 6th Floor
Boston, MA 02116

You may also make a verifiable consumer request on behalf of your minor child.

You or your authorized agent may only make a verifiable consumer request for access or data deletion twice within a twelve (12) month period. The verifiable consumer request must provide sufficient information that allows Liberty Mutual to reasonably verify that you are the person about whom Liberty Mutual collected personal data or an authorized representative of such person; and describe your request with sufficient detail that allows Liberty Mutual to properly understand, evaluate, and respond to it. For more information about how Liberty Mutual will verify your identity and how an authorized agent may make a request on your behalf, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

### Response Timing

Liberty Mutual will respond to a verifiable consumer request within forty-five (45) days of its receipt. If more time is needed, Liberty Mutual will inform you of the reason and extension period in writing.

Any disclosures that will be provided will only cover the twelve (12) month period preceding our receipt of the verifiable consumer request. If Liberty Mutual is unable to fulfill your request, you will be provided with the reason that the request cannot be completed. For more information about how we will respond to requests, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**Rights to opt in and out of data selling**

California consumers have the right to direct businesses not to sell your personal data (opt-out rights), and personal data of minors under 16 years of age will not be sold, as is their right, without theirs or their parents' opt-in consent. Liberty Mutual does not sell the personal data of consumers. For more information, go to libertymutual.com/privacy and click on the California Supplemental Privacy Policy.

**No account needed**

You do not need to create an account with Liberty Mutual to exercise your rights. Liberty Mutual will only use personal data provided in a request to review and comply with the request.

**No discrimination**

You have the right not to be discriminated against for exercising any of your CCPA rights. Unless permitted by the CCPA, exercising your rights will not cause Liberty Mutual to:

- Deny you goods or services;
- Charge you different prices or rates for goods or services, including through granting discounts or other benefits, or imposing penalties;
- Provide you a different level or quality of goods or services; or
- Suggest that you may receive a different price or rate for goods or services, or a different level or quality of goods or services.

**Will Liberty Mutual Update This Privacy Notice?**

We reserve the right to makes changes to this notice at any time and for any reason. The updated version of this policy will be effective once it is accessible. You are responsible for reviewing this policy to stay informed of any changes or updates.

**Who Do I Contact Regarding Privacy?**

If you have any questions or comments about this Notice or the Supplemental CCPA Notice, your rights, or are requesting the Notice in an alternative format, please do not hesitate to contact Liberty Mutual at:

**Phone:** 800-344-0197

**Email:** privacy@libertymutual.com

**Postal Address:** Attn: Privacy Office
Liberty Mutual Insurance Company
175 Berkeley St., 6th Floor
Boston, MA 02116




© 2019 Liberty Mutual Insurance

Liberty Mutual INSURANCE

**Coverage Is Provided In:**
The Ohio Casualty Insurance Company

Policy Number:
**BMO(21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Common Policy Declarations

| Named Insured & Mailing Address | Agent Mailing Address & Phone No. |
|---|---|
| 3371 READING LLC<br>24 E UNIVERSITY AVE OFC<br>CINCINNATI<br>CINCINNATI, OH 45219 | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC<br>615 ELSINORE PL STE 310<br>CINCINNATI, OH 45202-1475 |

62480292 007400 560

**Named Insured Is:** LIMITED LIABILITY COMPANY

**Named Insured Business Is:** RENNOVATION OF APARTMENT BUILDING

***In return for the payment of the premium, and subject to all the terms of this policy, we agree with you to provide the insurance as stated in this policy.***

## SUMMARY OF COVERAGE PARTS AND CHARGES

This policy consists of this Common Policy Declarations page, Common Policy Conditions, Coverage Parts (which consist of coverage forms and other applicable forms and endorsements, if any, issued to form a part of them) and any other forms and endorsements issued to be part of this policy.

| COVERAGE PART | CHARGES |
|---|---|
| **Commercial Inland Marine** | **$3,988.00** |

***Total Charges for all of the above coverage parts:*** ***$3,988.00***
***Certified Acts of Terrorism Coverage:*** ***$101.00*** ***(Included)***

***Note: This is not a bill***

17 of 24

## IMPORTANT MESSAGES

**IN THE EVENT OF CANCELLATION BY THE NAMED INSURED, THE COMPANY SHALL RETAIN NO LESS THAN $450.00 OF THE POLICY PREMIUM AS THE MINIMUM EARNED PREMIUM INCLUDING CERTIFIED ACTS OF TERRORISM COVERAGE, PLUS ANY APPLICABLE TAXES AND SURCHARGES.**

Issue Date 12/14/20

Authorized Representative

***To report a claim, call your Agent or 1-800-366-6446***

**DS 70 21 11 16**



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Liberty Mutual INSURANCE

**Coverage Is Provided In:**
The Ohio Casualty Insurance Company

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time*
*at Insured Mailing Location*

## Common Policy Declarations

| **Named Insured** | **Agent** |
|---|---|
| 3371 READING LLC<br>24 E UNIVERSITY AVE OFC<br>CINCINNATI<br>CINCINNATI, OH 45219 | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC<br>615 ELSINORE PL STE 310<br>CINCINNATI, OH 45202-1475 |

## SUMMARY OF LOCATIONS

0001 3371 Reading Rd, Cincinnati, OH 45229-3171

## POLICY FORMS AND ENDORSEMENTS

This section lists the Forms and Endorsements for your policy. Refer to these documents as needed for detailed information concerning your coverage.

| FORM NUMBER | TITLE |
|---|---|
| CL 01 00 03 99 | Common Policy Conditions |
| CL 01 26 01 01 | Amendatory Endorsement - OH |
| CL 06 00 01 15 | Certified Terrorism Loss |
| CL 07 00 10 06 | Virus or Bacteria Exclusion |
| CL 16 50 06 06 | Conditional Nuclear, Biological, and Chemical Terrorism Exclusion |
| CM 70 02 01 01 | IM 7904 04 04 Protective Devices Schedule |
| CM 70 02 01 01 | IM 7853 04 04 Protective Devices Endorsement |
| CM 88 19 12 11 | Commercial Inland Marine Policy Endorsement - Ohio Combined Coverages |
| IM 01 85 08 07 | Amendatory Endorsement - Ohio |
| IM 70 54 05 07 | Builders' Risk Coverage - Rehab And Reno Form |



In witness whereof, we have caused this policy to be signed by our authorized officers.

| | |
|---|---|
| Mark Touhey<br>Secretary | David Long<br>President |

***To report a claim, call your Agent or 1-844-325-2467***
**DS 70 21 11 16**

Liberty Mutual INSURANCE

**Coverage Is Provided In:**
The Ohio Casualty Insurance Company

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time at Insured Mailing Location*

## Commercial Inland Marine Declarations

| **Named Insured** | **Agent** |
|---|---|
| 3371 READING LLC | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC |

## SUMMARY OF CHARGES

**Explanation of Charges**

| DESCRIPTION | PREMIUM |
|---|---|
| Builders Risk | $3,887.00 |
| Commercial Inland Marine Schedule Totals | $3,887.00 |
| Certified Acts of Terrorism Coverage | $101.00 |

***Total Advance Charges: $3,988.00***

*Note: This is not a bill*

62480292 007400 560 19 of 24

*To report a claim, call your Agent or 1-844-325-2467*

**DS 70 22 01 08**



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Liberty Mutual INSURANCE

*Coverage Is Provided In:*
The Ohio Casualty Insurance Company

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time at Insured Mailing Location*

**Commercial Inland Marine Declarations Schedule**

| Named Insured | Agent |
| --- | --- |
| 3371 READING LLC | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC |

# SCHEDULE OF COVERAGES

## BUILDERS' RISK -- REHABILITATION AND RENOVATION

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

**SCHEDULED JOBSITE**

**DESCRIPTION OF PROJECT**

renovation of apartment building

**SCHEDULED LOCATIONS**

| Loc. No. | Location | Limit |
| --- | --- | --- |
| 0001 | 3371 Reading Rd<br>Cincinnati, OH 45229 | $ |

| Job No. | Jobsite |
| --- | --- |
| 001 | 3371 Reading Rd<br>Cincinnati, OH 45229 |

( ) Attach Additional Scheduled Jobsite Locations (check if applicable)

**Building Materials Limit** -- $ 450,000

**Existing Building Limit** -- $ 700,000

*To report a claim, call your Agent or 1-844-325-2467*

**IM 70 59 05 07**

Liberty Mutual INSURANCE

*Coverage Is Provided In:*
The Ohio Casualty Insurance Company

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time at Insured Mailing Location*

# Commercial Inland Marine Declarations Schedule

| **Named Insured** | **Agent** |
|---|---|
| 3371 READING LLC | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC |

62480292 007400 560 21 of 24

## SCHEDULED LOCATIONS

### Existing Building Coverage (check one):

( X) Coverage Provided
(   ) Coverage Not Provided

### Existing Building Valuation (check one):

(   ) Stated Value
( X) Actual Cash Value

## COVERAGE EXTENSIONS

| | |
|---|---|
| Additional Debris Removal Expenses | $ 5,000 |
| Limited Fungus Coverage | $ 15,000 |

## SUPPLEMENTAL COVERAGES

| | |
|---|---|
| Pollutant Cleanup and Removal | $ 10,000 |
| Temporary Storage Locations | $ 10,000 |
| Transit | $ 10,000 |

## DEDUCTIBLE

| | |
|---|---|
| Deductible Amount | $ 2,500 |

## COINSURANCE (Select One)

(X) 100%
( ) Coinsurance Provisions Are Waived

## COVERAGE LIMITATION

( X) **Vacant Building**-- "We" only cover a vacant "existing building" for 60 consecutive days from the inception date of this policy unless building permits have been obtained and rehabilitation or renovation work has begun on the "existing building".

(   ) **Vacant Building Limitation Waived**

*To report a claim, call your Agent or 1-844-325-2467*

**IM 70 59 05 07**



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Liberty Mutual INSURANCE

Coverage Is Provided In:
The Ohio Casualty Insurance Company

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time at Insured Mailing Location*

**Commercial Inland Marine Declarations Schedule**

| Named Insured | Agent |
|---|---|
| 3371 READING LLC | (513) 561-5311<br>CAMARGO INSURANCE AGENCY INC |

## SUPPLEMENTAL COVERAGES (cont)

### WHEN COVERAGE CEASES

Coverage will end when one of the following first occurs:

1. this policy expires or is canceled;
2. a covered building or structure is accepted by the purchaser;
3. "your" insurable interest in the covered property ceases;
4. "you" abandon construction with no intent to complete it; or
5. a covered building or structure has been completed for more than 30 days (unless a different number of days is shown below).

Optional Number Of Days (replaces item 5. above if number is entered)

A covered building or structure has been completed for more than ____ days.

### OPTIONAL COVERAGES AND ENDORSEMENTS

*To report a claim, call your Agent or 1-844-325-2467*

**IM 70 59 05 07**



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time*
*at Insured Mailing Location*

# General Endorsement

62480292 007400 560 23 of 24

This Endorsement Changes The Policy. Please Read It Carefully.

## IM 7904 04 04 Protective Devices Schedule

AAIS
IM 7904 04 04
Page 1 0f 1

This endorsement changes
the Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

PROTECTIVE DEVICES SCHEDULE

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours

IM 7904 04 04 Copyright, American Association of Insurance Services, Inc. 2004

*To report a claim, call your Agent or 1-844-325-2467*

Policy Number:
**BMO (21) 62 48 02 92**

Policy Period:
**From 12/11/2020 To 12/11/2021**
*12:01 am Standard Time*
*at Insured Mailing Location*

## General Endorsement

This Endorsement Changes The Policy. Please Read It Carefully.

### IM 7853 04 04 Protective Devices Endorsement

AAIS
IM 7853 04 04

This endorsement changes
the Inland Marine Coverage
- PLEASE READ IT CAREFULLY -

PROTECTIVE DEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

OTHER CONDITIONS

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

PERILS EXCLUDED

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

IM 7853 04 04 Copyright, American Association of Insurance Services, Inc., 2004



*To report a claim, call your Agent or 1-844-325-2467*



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Exhibit 2

Liberty Mutual Insurance
James Wormington
Commercial Insurance Property Claims
PO Box 5014
Scranton, PA 18505-5014
Fax: 888-268-8840

September 30, 2021

3371 Reading LLC
Attention: Zachary Gottesman
404 East Twelfth Street, First Floor
Cincinnati, OH 45202-7463

| | |
|---|---|
| Subject: Insured: | 3371 Reading LLC |
| Loss Location: | 3371 Reading Rd, Cincinnati, OH 45229-3171 |
| Date of Loss: | 8/6/2021 |
| Type of Loss: | Fire damage |
| Policy Number: | BMO 624802921 |
| Policy Effective: | 12/11/2020 to 12/11/2021 |
| Claim Number: | 23942862 |
| Underwriting Co.: | Ohio Casualty |

Dear Mr. Gottesman:

This letter is to inform you that we have conducted an investigation of your client's claim for fire damage at the above referenced location. We have completed our review of the information provided by you or on the insured's behalf. The following is a summary of our findings and position on coverage for the claim asserted.

The insurance policy issued to 3371 Reading LLC provides coverage subject to the policy terms and conditions. Based on our investigation and review of the policy, the policy does not provide coverage for your loss as outlined below.

**The Loss**

Our first notice of the above loss was on August 9th, 2021. It was reported that there was a large fire with a collapse of the roof and upper floors at the property.

Our investigation confirmed that a fire occurred to the property. The investigation indicates the cause of ignition is undetermined. We also confirmed that no fencing was placed around the jobsite. The placement of a fence around the jobsite is a policy requirement..

**The Policy**

**BUILDERS' RISK COVERAGE**
**REHABILITIATION AND RENOVATION FORM IM 7054 05 07**

This Endorsement Changes The Policy. Please Read It Carefully.

**IM 7904 04 04 Protective Devices Schedule**

This endorsement changes the Inland Marine Coverage
-PLEASE READ IT CAREFULLY-

Protective Devices Schedule

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours.

***

**This Endorsement Changes The Policy. Please Read It Carefully.**

**IM 7853 04 04 Protective Devices Endorsement**

This endorsement changes the Inland Marine Coverage
-PLEASE READ IT CAREFULLY-

PROTECTIVE DEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

OTHER CONDITIONS

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

PERILS EXCLUDED

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

**APPLICATION OF POLICY**

In an effort to alert you to the basis of the denial of coverage, we list below the grounds under which all aspects of the claim are not covered under the policy. It is our intent to incorporate by reference all of the terms of the policy through this denial of coverage letter. Based upon the information available to date, the grounds for the denial of coverage under the policy, or under applicable law, with respect to the claim, include, but are not limited to, the following:

No fencing was placed around the jobsite as required by the Protective Devices Endorsement on the policy.

Based on the above we find no coverage under the terms and conditions of your policy for the costs claimed in connection with your asserted claim and therefore deny your claim. In view of the absence of coverage, we make no comment relative to the amount of loss or damage but include those issues within the rights reserved.

The foregoing is not intended to waive any defenses which are now, or which may hereafter become available to us. The foregoing does not constitute a waiver of any term, condition, or exclusion of the insurance policy or any rights and defenses under the policy, and we hereby expressly reserve all of our rights and defenses thereunder.

***

**10. Suit Against Us --** No one may bring a legal action against "us" under this coverage unless:

> **a.** all of the "terms" of this coverage have been complied with; and
>
> **b.** the suit has been brought within two years after "you" first have knowledge of the loss.
>
> If any applicable law makes this limitation invalid, then suit must begin within the shortest period permitted by law.

If you have any questions about the content of this letter or the terms and provisions of your policy of insurance, please do not hesitate to call me.

Sincerely,

James Wormington
General Adjuster
(P) 314-341-7198

Cc: Camargo Insurance Agency Inc.
Attention: Jay Muller
615 Elsinore Pl Ste 310
Cincinnati, OH 45202

3371 Reading LLC
Attention: Shlomi Fatal
24 E University Ave OFC
Cincinnati, OH 45219

Exhibit 3

**GOTTESMAN & ASSOCIATES, LLC**
**ATTORNEYS AT LAW**
404 EAST TWELFTH STREET, FIRST FLOOR
CINCINNATI, OHIO 45202-7463
EMAIL: zg@zgottesmanlaw.com
TELEPHONE: 513-651-2121
FACSIMILE: 513-586-0655

22 October 2021

***Via Email Only (james.wormington @LibertyMutual.com)***

James Wormington
Liberty Mutual Insurance
P.O. Box 5014
Scranton, PA 18505-5014

***Re: 3371 Reading LLC v. Liberty Mutual Insurance***

Dear Mr. Wormington:

This is a response to your letter denying coverage under Policy BMO 62480292 for the fire loss that occurred on Aug. 6, 2021, at my client/your insured's property located a 3371 Reading Road in Cincinnati, Ohio. Your stated basis for denying coverage is that: "No fencing was placed around the jobsite as required by the Protective Devices Endorsement on the policy". Set forth below are the facts, applicable law and an explanation as to why your denial of coverage is tortious bad faith.

**1. Facts**

**a. The property, the building, and the fire**

The property is located at 3371 Reading Road. It contained a building, and it was acquired by your insured on May 4, 2020. In anticipation of renovating the building, your insured procured an Inland Marine Insurance Policy with Builders' Risk coverage (Policy No. BMO 62480292) through Camargo Insurance Company, Inc., an insurance agency with which your insured had a longstanding relationship, and which had procured numerous policies on your Insured's behalf.

The building was comprised of vacant apartments. Significantly, the building extends to the property line on 3 sides. In particular, the building is abutted on the south side by another building, on the east side by a public sidewalk, and on the north side by a property owned by a third-party.[1] No fence existed around the building/jobsite because it was not possible to put a fence on the south, east, or north sides of the building. On August 6, 2021, while renovations were underway, but not during work hours, there was a fire that destroyed the building. The Cincinnati Fire Department did a cause and origin investigation that was inconclusive. The cause and origin

[1] See attached Exhibit A.

of the fire remain undetermined.[2] The building was a total loss, and it has been razed with the approval of the City of Cincinnati.

**b. The application process for Policy No. BMO 62480292 and similar policies.**

According to Jacob Mueller, the President of Camargo Insurance Agency, Inc., and the agent who issued Policy No. BMO62480292, from May of 2019 through the date of loss, he applied for Commercial Inland Marine Insurance including Builders' Risk Coverage on behalf of various insureds[3] with Liberty and/or its affiliates ("Liberty") approximately 22 times.[4] Out of 22 policies, Policy No. BMO62480292 was the only policy to include the "Protective Devices Schedule" and "Protective Devices Endorsement", both of which you relied upon as the sole basis to decline coverage for this claim. Mr. Mueller indicates that when applying for these policies, neither the "Protective Device Schedule" nor the "Protective Devices Endorsement" are available under the "Mandatory Forms" or "Optional Forms" input menus.[5] According to Mr. Mueller, the clearly established course of dealing was not to include the "Protective Devices Schedule" and "Protective Devices Endorsement" in a policy. However, Liberty's underwriter, Jonathan Jones, never mentioned the inclusion of those provisions when he issued the policy, and he did nothing to bring them to Mr. Mueller's attention.[6]

Mr. Mueller further indicates there was nothing in the online application process asking about the presence of, or even the possibility of installing, fencing around the jobsite.[7] Instead, the online application included one simple question: "Please describe the security measures at insured's yard and jobsites"; to which Mr. Mueller responded: "Building Secured".[8] This is crucial because had the issue been raised during the underwriting phase, Mr. Mueller and your insured would have informed Liberty that it was impossible to install fencing around this jobsite. As explained above, the insured building was abutted on the south side by another building, on the east side by a public sidewalk, and on the north side by property owned by a third party. These facts made it impossible to erect or maintain "a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated." These physical characteristics of the building immediately would have been discovered through even the most basic underwriting processes, such as looking at the building on Google maps or simply asking the agent as part of the questions Liberty includes in its online application.

**2. The Policy Language**

---

[2] See attached Exhibit B.
[3] Many of which, like 3371 Reading LLC, are owned in part or whole by Vision & Beyond Group, LLC.
[4] Affidavit of Jacob Mueller, ¶ 4, Ex. 1.
[5] Affidavit of Jacob Mueller, ¶ 11.
[6] Affidavit of Jacob Mueller, ¶ 13.
[7] Affidavit of Jacob Mueller, ¶ 10.
[8] Affidavit of Jacob Mueller, ¶ 9.

The specific language of policy BMO62480292 upon which Liberty relies in this case is set forth in two separate endorsements on the policy. The first endorsement is captioned the "Protective Devices Schedule" which provides:

**IM 7904 04 04 Protective Devices Schedule**

AAIS
IM 7904 04 04
Page 1 0f 1

This endorsement changes
the Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

PROTECTIVEDEVICES SCHEDULE

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours

IM 7904 04 04 Copyright, American Association of Insurance Services, Inc. 2004

And the second is the "Protective Devices Endorsement":

**IM 7853 04 04 Protective Devices Endorsement**

AAIS
IM 7853 04 04

This endorsement changes
the Inland Marine Coverage
- PLEASE READ IT CAREFULLY -

PROTECTIVEDEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

OTHER CONDITIONS

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

PERILS EXCLUDED

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

## 3. Legal Analysis

**a. The clear and unambiguous meaning of the language Liberty imposed on its insured in the Protective Devices Endorsement and the Protective Devices Schedule compels the conclusion that coverage is owed.**

Insurance policies are contracts and, as such, their interpretation is a matter of law for the court. *Sharonville v. Am. Employers Ins. Co.*, 109 Ohio St. 3d 186, 187, 2006 Ohio 2180, P6, 846 N.E.2d 833, citing *Alexander v. Buckeye Pipe Line Co.* (1978), 53 Ohio St.2d 241, 374 N.E.2d 146, paragraph one of the syllabus. When Courts perform this function they are guided by the fact that contract terms are to be given their plain and ordinary meaning. *Id*. In other words, insurance coverage is determined by reasonably construing the contract in conformity with the intention of the parties which is reflected by the ordinary and commonly understood meaning of the language used. *La Plas Condo. Assn. v. Utica Natl. Ins. Group*, 3d. Dist. No. 5-04-15, 2004 Ohio 5347, P19, citing *King v. Nationwide Ins. Co.* (1988), 35 Ohio St.3d 208, 211, 519 N.E.2d 1380.

In addition, when, as here, an insurer denies liability coverage based upon a policy exclusion, the insurer bears the burden of demonstrating the applicability of the exclusion. See *Continental Ins. Co. v. Louis Marx & Co.* (1980), 64 Ohio St.2d 399, 415 N.E.2d 315, at syllabus. Furthermore, "an exclusion in an insurance policy will be interpreted as applying only to that which is clearly intended to be excluded." *Hybud Equip. Corp. v. Sphere Drake Ins. Co., Ltd*. (1992), 64 Ohio St.3d 657, 665, 597 N.E.2d 1096 (emphasis sic.). "The insurer, being the one who selects the language in the contract, must be specific in its use; an exclusion from liability must be clear and exact in order to be given effect." *Lane v. Grange Mut. Cos*. (1989), 45 Ohio St.3d 63, 65, 543 N.E.2d 488, citing *Am. Fin. Corp. v. Fireman's Fund Ins. Co*. (1968), 15 Ohio St.2d 171, 239 N.E.2d 33.

**i. "If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule"**

The above-quoted language is reprinted verbatim from the "Protective Devices Endorsement". To your insured, or any other reader, the word "schedule" at the end of the sentence would be understood to refer to the "Protective Devices Schedule" referenced at the beginning of the sentence. However, there are no locations "described" on the "Protective Devices Schedule". Obviously, there is no requirement for there to be any location actually described on the Protective Devices Schedule, as the sentence containing this condition begins with "If". Therefore, by its clear and unambiguous terms, the "Protective Devices Endorsement" does not apply to this loss. That conclusion is further reinforced based on other language in that endorsement set forth below.

**ii. "Protective Devices – 'You' are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule."**

Once again, the above-quoted language is reprinted verbatim from the "Protective Devices Endorsement". The word "maintain" is not defined anywhere in the policy. Yet, its meaning is clear and unambiguous nonetheless. The Merriam-Webster dictionary definition of the word "maintain" is "to keep in an existing state (as of repair, efficiency, or validity)"; "to sustain"; "to

continue". Specifically, it does not mean "to erect or install" fencing, particularly where no fencing can be erected or installed. Therefore, Liberty's use of the word "maintain" with regard to "fencing" would clearly and unambiguously require the same to be maintained at the jobsite if a fence, in fact, existed at the property. However, it clearly and unambiguously does not require the erection (or, as you wrote in your denial letter, the placing) of a fence where none existed, particularly where, as here, it would have been impossible to erect and maintain a fence "around the jobsite".. Simply put, there is no requirement anywhere in the policy to place fencing around the jobsite. Therefore, your stated basis for denying coverage is nothing more than a rewrite of a policy exclusion in order to deny coverage Liberty otherwise owed. That is text-book bad faith.

**b. Policy BMO62480292 is illusory.**

Your bad faith coverage denial not only rewrites the clear and unambiguous terms of the Liberty endorsements, it imposes an impossibility on your insured of erecting and maintaining a fence "around the jobsite" in order for there ever to be any fire or theft coverage. As such, your rewriting of the policy renders any fire or theft coverage illusory. No loss by fire or theft would ever be covered by the policy as issued, because your insured could never comply with the "Protective Devices Schedule" and "Protective Devices Endorsement" as you have chosen to rewrite them. An insurance provision is illusory when it appears to grant a benefit to the insured, although in reality, it does not. *Coleman v. Progressive Preferred Ins. Co.*, 1st Dist. No. C-070779, 2008 Ohio 3568, P13; *GenCorp., Inc. v. AIU Ins. Co.* (N.D. Ohio 2000), 104 F.Supp.2d 740, 745. Courts won't give insurance provisions a meaning that would render them illusory. *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007 Ohio 2722, P133, 873 N.E.2d 345; *Talbert v. Continental Cas. Co.*, 157 Ohio App. 3d 469, 2004 Ohio 2608, 811 N.E.2d 1169. Courts certainly don't rewrite the clear and unambiguous language of policy exclusions in order to benefit insurers and punish insureds who paid their premiums, suffered a catastrophic business loss, and then were denied even the possibility of coverage for the loss.

**c. The Insured's failure to erect and maintain "fencing around the jobsite", even if required by the rewritten policy, is not a material term of the policy.**

In this case, Liberty has made no effort to prove or establish how the presence of "fencing around the jobsite" would have prevented the loss at issue. The cause of the fire is undetermined. As an insurer relying upon an exclusion, Liberty must have some basis for claiming the presence of fencing would have prevented the loss, or that the lack of a fence played some role in causing the loss. Liberty has made no effort to do so. A similar endorsement was at issue in *Praetorian Ins. Co. v. Axia Contr., LLC* (10th Cir., 2019), 794 Fed. Appx. 791.[9] In that case, the Court held that in the absence of some causal connection between the lack of fencing and the cause of the fire, the carrier could not rely on the "Protective Devices Schedule" and the "Protective Devices Endorsement" as a basis to deny coverage for a fire loss.

**4. Conclusion**

[9] Attached as Exhibit C.

Liberty's denial of coverage is text-book tortious bad faith. The policy as issued provides no basis to deny coverage for this fire loss. In fact, your coverage position, which actually relies upon your rewrite of the policy language, even if allowed, would permit Liberty to never pay fire and theft coverage under the policy. That makes any fire and theft coverage illusory. Whether a court interprets the policy as issued, or as rewritten by you, there is still no way your insured could have complied with the "Protective Devices Schedule" and "Protective Devices Endorsement". So, Liberty's decision to deny coverage is not based upon any reasonable justification and is not fairly debatable under the facts or the law. Simply put, you committed bad faith and your insured has already suffered damage, including incurring attorney fees. Please reconsider your decision and provide coverage for this loss immediately and agree to pay the damages incurred to date. Failure to do so within 10 days of this letter will result in litigation seeking to recover appropriate compensatory damages, punitive damages and attorney fees.

Kind regards,

Zach Gottesman

Zachary Gottesman


Google Maps
https://www.google.com/maps/@39.1407635,-84.4935095,91m/data=!3m1!1e3
Clio - Dashboard
Google
TD Ameritrade
Efiling
Clerk
US Bank
Efax
Ohio State Bar Asso...
Supreme Court of O...
Online Sports Bettin...
Merrill
Conference Call
Box
Other Bookmarks
Search Google Maps
Groceries
Restaurants
Takeout
Hotels
Gas
Pharmacies
Coffee
Layers
576
574
580
582
583
581
585
589
591
3363
3371
3381
3372
803
807
3362
Blair Ave
Reading Rd
42
Google
Imagery ©2021 Maxar Technologies, Sanborn, U.S. Geological Survey, Map data ©2021 Google
United States
Terms
Privacy
Send feedback
10 m

Exhibit 1

Print Date: 10/12/2021

# NFIRS.NET FULL INCIDENT REPORT

Cincinnati Fire Department

| Incident Date | Cad # | Exp # | Location | Closed | Incident Type |
|---|---|---|---|---|---|
| 08/06/2021 | 21218241 | 0 | Street address | Yes | Fire - Building |

**Address**

**3371** **READING RD**

**CINCINNATI** **Ohio** **45229**

**HALE AV/BLAIR AV**

**Closed by** 10975 STELTER JASON A

**Alarm:** 8/6/21 20:16

**Arrive:** 8/6/21 20:18

**Controlled:**

**Clear:** 8/7/21 7:59

**Aid Type:** None

**Aid FDID:**

**Aid Incident #:**

**Property $ Loss:** 200,000.00

**Content $ Loss:** 0.00

**Casualties:**

| | Fire | Other |
|---|---|---|
| **Injuries:** | 0 | 0 |
| **Deaths:** | 0 | 0 |

| | Suppression | EMS | Other | |
|---|---|---|---|---|
| **App Count:** | 20 | 3 | 5 | No |
| **Person Count:** | 68 | 5 | 11 | |

**Detector:** Detector did not alert occupants

**Hazmat Release:** None

**Mix prop:** Not mixed use

Firefighters were dispatched this evening after multiple calls were received reporting a building fire in Avondale. On arrival, crews were presented with a large, 3 story, commercial building with heavy fire coming through the roof and the rear of the building. Initial crews were able to enter the structure and perform a quick search but due to the deteriorating conditions were forced to withdraw and fight the fire defensively from the exterior. After a quick knockdown, crews again entered the building and extinguished the fire. Fire personnel and investigators are still on scene extinguishing smoldering fire and working to determine a cause. There were no reported injuries to civilians or firefighters. C544 was the Cincinnati Fire Investigator on this fire.****C544**** Responded to the scene at the request of D-1 to conduct an origin and cause investigation. A systematic approach was used to document the scene, take photographs and collect witness statements. No witnesses or cameras in the area. Entire building was under renovation. Due to the collapsed roof and the second floor collapsed into the first floor FIU could not enter the fire origin area. Electric was shut off to the entire building. Construction crews were in the building running "plex" plumbing and state no torches were used or present at the site. Building was demolished prior to FIU gaining access to the fire apartments. Fire is undetermined at this time.

## Incident Actions Taken

Extinguishment by fire service personnel

Print Date: 10/12/2021

# NFIRS.NET FULL INCIDENT REPORT

Cincinnati Fire Department

**Incident Date** **Cad #** **Exp #** **Location** **Closed** **Incident Type**

## Basic Fire Information

**Exposure #**
0

**Origin Type:** Undetermined N

**Heat Source:** Undetermined
**Equip Involved:** Y
**Suppression Factor:** N

**First Ignited:** Undetermined
**Ignition Desc:**

**Material Ignited:** Multiple types of material
**Equip Brand:**
**Mobile Property:** None

**Ignition Cause:** Cause under investigation
**Equip Model:**
**Mix Property:**

**Factor:** False
**Serial #:**
**Property Make:**

**Human Factor** None
**Equip Yr:** 2021
**Property Model:**

**Human Age**
**Power type:**
**Property Yr:**

**Count**
**Portability:**
**License Number:**

**Buildings:** 1 N
**Materials Onsite:** N
**Mobile Prop St:** BL

**Units:** 24 N
**Mobile Prop Vin:**

**Acres:** 0 Y N

## Building Fire Information

Exposure #
0 08/06/2021 241

**Length** **Width**

**StructureType:** Enclosed building
**Floor Size:** 12484 OR X

**Status:** Under major renovation
**Fire Origin:** 2 No

**Fire Spread:** Confined to building of origin **None**
**Above Grade:** 3
**Auto Exting Presence:** None Present

**First Ign Material:** Multiple types of material N
**Below Grade:** 0
**Auto Exting Type:**

**First Ignition:** Undetermined
**Minor Damage:** 0
**Auto Exting Operation:**

**Detector Pres:** None present
**Significant Damage:** 1
**Auto Exting Failure:**

**Detector Pwr:**
**Heavy Damage:** 1
**Number Heads:** N

**Detector Op:**
**Extreme Damage:** 1

**Detector Desc:**

**Detector Fail:**



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Print Date: 10/12/2021

# NFIRS.NET FULL INCIDENT REPORT

Cincinnati Fire Department

**Incident Date** **Cad #** **Exp #** **Location** **Closed** **Incident Type**

## Apparatus Information

| Exposure | Seq | ID | Dispatched | Arrive | Cleared | #people | Desc |
|---|---|---|---|---|---|---|---|
| 0 | 15 | HR14 | 8/6/2021 8:18:00PM | 8/6/2021 8:25:00PM | 8/6/2021 10:42:00PM | 4 | Suppression |
| 0 | 4 | T23 | 8/6/2021 8:16:00PM | 8/6/2021 8:19:00PM | 8/6/2021 11:21:00PM | 4 | Other |
| 0 | 1 | ALS32 | 8/6/2021 8:16:00PM | 8/6/2021 8:18:00PM | 8/6/2021 10:29:00PM | 1 | Other |
| 0 | 18 | E3 | 8/6/2021 8:18:00PM | 8/6/2021 8:27:00PM | 8/6/2021 9:30:00PM | 4 | Suppression |
| 0 | 3 | T19 | 8/6/2021 8:16:00PM | 8/6/2021 8:18:00PM | 8/7/2021 12:30:00AM | 4 | Suppression |
| 0 | 21 | E5 | 8/6/2021 8:16:00PM | 8/6/2021 8:39:00PM | 8/6/2021 10:20:00PM | 4 | Suppression |
| 0 | 16 | SO2 | 8/6/2021 8:16:00PM | 8/6/2021 8:26:00PM | 8/6/2021 10:58:00PM | 1 | Other |
| 0 | 19 | M19 | 8/6/2021 8:16:00PM | 8/6/2021 8:29:00PM | 8/6/2021 11:19:00PM | 2 | EMS |
| 0 | 7 | HR9 | 8/6/2021 8:16:00PM | 8/6/2021 8:20:00PM | 8/6/2021 10:44:00PM | 4 | Other |
| 0 | 9 | D1 | 8/6/2021 8:16:00PM | 8/6/2021 8:21:00PM | 8/6/2021 11:40:00PM | 1 | Suppression |
| 0 | 13 | E23 | 8/6/2021 8:20:00PM | 8/6/2021 8:24:00PM | 8/6/2021 10:15:00PM | 4 | Suppression |
| 0 | 12 | E19 | 8/6/2021 8:16:00PM | 8/6/2021 8:24:00PM | 8/6/2021 11:59:00PM | 4 | Suppression |
| 0 | 20 | D02 | 8/6/2021 8:23:00PM | 8/6/2021 8:30:00PM | 8/6/2021 10:05:00PM | 1 | Other |
| 0 | 5 | T32 | 8/6/2021 8:16:00PM | 8/6/2021 8:19:00PM | 8/6/2021 11:30:00PM | 4 | Suppression |
| 0 | 11 | E34 | 8/6/2021 8:16:00PM | 8/6/2021 8:23:00PM | 8/7/2021 1:06:00AM | 4 | Suppression |
| 0 | 6 | E9 | 8/6/2021 8:16:00PM | 8/6/2021 8:20:00PM | 8/6/2021 10:38:00PM | 4 | Suppression |
| 0 | 22 | L31 | 8/6/2021 8:34:00PM | 8/6/2021 8:40:00PM | 8/6/2021 11:11:00PM | 4 | Suppression |
| 0 | 8 | M9 | 8/6/2021 8:16:00PM | 8/6/2021 8:20:00PM | 8/6/2021 10:08:00PM | 2 | EMS |
| 0 | 23 | L02 | 8/6/2021 8:34:00PM | 8/6/2021 8:43:00PM | 8/6/2021 10:35:00PM | 4 | Suppression |
| 0 | 17 | E12 | 8/6/2021 8:18:00PM | 8/6/2021 8:27:00PM | 8/6/2021 10:17:00PM | 4 | Suppression |
| 0 | 10 | D3 | 8/6/2021 8:16:00PM | 8/6/2021 8:21:00PM | 8/6/2021 10:14:00PM | 1 | Suppression |
| 0 | 14 | L03 | 8/6/2021 8:18:00PM | 8/6/2021 8:24:00PM | 8/6/2021 11:31:00PM | 4 | Suppression |
| 0 | 2 | E32 | 8/6/2021 8:16:00PM | 8/6/2021 8:18:00PM | 8/6/2021 11:28:00PM | 4 | Suppression |



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

# Praetorian Ins. Co. v. Axia Contr., LLC

United States Court of Appeals for the Tenth Circuit

December 31, 2019, Filed

No. 19-1113

**Reporter**
***794 Fed. Appx. 791*** *

PRAETORIAN INSURANCE COMPANY, Plaintiff Counter Defendant-Appellee, v. AXIA CONTRACTING, LLC; 255 BLACKHAWK HOSPITALITY, LLP, Defendant Counterclaimants-Appellants.

**Notice:** PLEASE REFER TO FEDERAL RULES OF APPELLATE PROCEDURE RULE 32.1 GOVERNING THE CITATION TO UNPUBLISHED OPINIONS.

**Prior History:** (D.C. No. 1:17-CV-02034-WJM-SKC). (D. Colo.).

Praetorian Ins. Co. v. Axia Contr., LLC, 2019 U.S. Dist. LEXIS 33011, 2019 WL 1002939 (D. Colo., Mar. 1, 2019)

**Counsel:** For PRAETORIAN INSURANCE COMPANY, Plaintiff Counter Defendant - Appellee: Kelly L. Kafer, Peter J. Morgan, Morgan Rider Riter Tsai, Denver, CO.

For AXIA CONTRACTING, LLC, Defendants Counterclaimants - Appellants: Michael P. Murray, Scott Warren Wilkinson, Davis & Ceriani, Denver, CO.

**Judges:** Before LUCERO, PHILLIPS, and MORITZ, Circuit Judges.

**Opinion by:** Carlos F. Lucero

## Opinion

**[*791] ORDER AND JUDGMENT***

Axia Contracting, LLC, ("Axia") and 255 Blackhawk Hospitality, LLP, ("Blackhawk") appeal a district court order granting summary judgment in favor of Praetorian Insurance Company ("Praetorian"). Exercising jurisdiction under 28 U.S.C. § 1291, we reverse and remand for further proceedings.

**I**

In 2017, defendants were engaged in a hotel construction project in Aurora, Colorado. Blackhawk was the owner of the property, and Axia was the general contractor. On June 19, a fire occurred at the property resulting in extensive damage. The cause of the fire was determined to be arson.

**[*792]** At the time of the fire, a builder's risk policy issued by Praetorian was in effect. The policy included a Protective Devices Endorsement ("PDE") for which defendants received a 10% premium credit. Under the header "Other Conditions," the PDE required that the insureds "maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule [("PDS")]." The PDS required that the jobsite

---

* This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

"will be protected with chain link fencing" and that "[a]ll entrance and access gates shall remain securely locked during non-working hours." Coverage for losses caused by fire were excluded if, prior to the fire, the insureds (1) "had knowledge of any suspension or impairment in the protective device or service described on the [PDS] and did not notify" the insurer, or (2) "failed to maintain in complete working order, the fire protective device or service described on the [PDS] which [the insureds] control." In addition, the policy excluded coverage for loss caused by theft if a "device or service, shown on the [PDS], provides theft protection" and the insureds failed to maintain the "theft protective device or service."

Following the fire, defendants requested coverage under the policy. Praetorian denied coverage because the project jobsite was not enclosed by chain link fencing at the time of the fire and all entrance and access gates were not securely locked. In a letter from Praetorian's counsel, the insurer indicated that the fencing requirement was a condition precedent to coverage and fell within the fire-protection exclusion.

Praetorian filed a declaratory judgment action seeking a declaration that the policy does not provide coverage for the fire. Axia responded with counterclaims for declaratory judgment, breach of contract, and bad faith. Praetorian moved for summary judgment, arguing that protective fencing was a condition of coverage and that the fire-protection exclusion barred coverage. After summary judgment briefing was complete, the district court sua sponte requested additional, simultaneous briefs on the question of whether the failure to maintain fencing was a material breach. The district court then granted summary judgment in favor of Praetorian on that basis. Axia and Blackhawk timely appealed.

**II**

We review a district court's grant of summary judgment de novo. Genberg v. Porter, 882 F.3d 1249, 1253 (10th Cir. 2018). A party is entitled to summary judgment only if the evidence shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Id. "Because the parties' arguments assume that Colorado law applies, we will proceed under the same assumption." Grynberg v. Total S.A., 538 F.3d 1336, 1346 (10th Cir. 2008).

Under Colorado law, the question of material breach is one of fact. Kaiser v. Mkt. Square Disc. Liquors, Inc., 992 P.2d 636, 640 (Colo. App. 1999). A material breach "goes to the root of the matter or essence of the contract and renders substantial performance under the contract impossible." Interbank Invs., LLC v. Vail Valley Consol. Water Dist., 12 P.3d 1224, 1229 (Colo. App. 2000) (quotations and citation omitted). If a material breach occurs, it "excuses further performance by the other party." Kaiser, 992 P.2d at 640. "Materiality must be assessed in the context of the expectations of the parties at the time the contract was formed." Coors v. Sec. Life of Denver Ins. Co., 112 P.3d 59, 64 (Colo. 2005).

"Employing general principles of contract interpretation, we give effect to the intent and reasonable expectations of the **[*793]** parties by enforcing the plain language of the contract." Owners Ins. Co. v. Dakota Station II Condo. Ass'n, Inc., 443 P.3d 47, 51, 2019 CO 65 (Colo. 2019) (quotation omitted). "Accordingly, unless the parties intend otherwise, terms in an insurance policy should be assigned their plain and ordinary meaning." Thompson v. Maryland Cas. Co., 84 P.3d 496, 501 (Colo. 2004). "[W]e read the provisions of the policy as a whole, construing the policy so that all provisions are harmonious and none is rendered meaningless." Martinez v. Am. Fam. Mut. Ins. Co., 413 P.3d 201, 203, 2017 COA 15 (Colo. App. 2017). "Exclusionary clauses designed to insulate particular conduct from general liability coverage provisions must be drafted in clear and specific language." Am. Fam. Mut. Ins. Co. v. Johnson, 816 P.2d 952, 953 (Colo. 1991).

Applying these principles, we must reject the district court's conclusion that defendants' failure to maintain fencing and secured access was a material breach. The policy sets forth specific consequences for failing to maintain fire or theft protective devices listed in the PDS: coverage is excluded for loss caused by fire or theft, respectively. This clear manifestation of the parties' expectations controls. See Coors, 112 P.3d at 64. In contrast, the district court's material breach theory would have far greater consequences than those intended by the parties. A material breach excuses the other "party from performing its duties under a contract." Converse v. Zinke, 635 P.2d 882, 887 (Colo.



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

1981); see also Kaiser, 992 P.2d at 640. As defendants argue, treating the failure to fence as a material breach could excuse Praetorian's obligation to cover damage from a tornado. Such a result is clearly inconsistent with the parties' expectations as indicated by the policy's plain terms. Further, such a reading would render superfluous the specific consequences set forth in the PDE. Cf. Martinez, 413 P.3d at 203 (policy should be construed so that no provisions are "rendered meaningless").

Praetorian also urges us to affirm on alternative bases raised below but not considered by the district court. Under these circumstances, "proper judicial administration generally favors remand for the district court to examine the issue initially." Pac. Frontier v. Pleasant Grove City, 414 F.3d 1221, 1238 (10th Cir. 2005). We elect to follow that path in the case at bar.

**III**

The district court's grant of summary judgment is **REVERSED** and the case is **REMANDED** for further proceedings consistent with this order and judgment.

Entered for the Court

Carlos F. Lucero

Circuit Judge

End of Document



E-FILED 12/25/2021 06:36 AM / CONFIRMATION 1142484 / A 2104408 / COMMON PLEAS DIVISION / IFIJ

Exhibit 4

**From:** **Harter, William M.** wharter@fbtlaw.com
**Subject:** RE: 3371 Reading, LLC v. Liberty Mutual Insurance Company
**Date:** November 23, 2021 at 9:53 AM
**To:** Zachary Gottesman zg@zgottesmanlaw.com
**Cc:** Tom B. Bruns tbruns@bcvalaw.com

WH

---

Zach –

My client has fully analyzed this claim and your letter and stands by the denial of the claim.

While not intended to be a comprehensive position, given the forthcoming litigation, I do want to make sure you are aware of the following facts. The same were not mentioned in your letter or the accompanying affidavit of Mr. Mueller, and are in some instances contrary to that affidavit. I am happy to discuss further if you like.

1. Based on risk factors identified regarding your client's property location, the Protective Devices Schedule and Protective Devices Endorsement were expressly added to the policy quote as requirements for the subsequent policy.

2. Lyn Plona of your client's insurance broker has confirmed that this quote was received, forwarded to your client before the policy was placed, and accepted by your client.

3. The Protective Devices Schedule and Protective Devices Endorsement were thereafter included in the policy as placed.

4. Ms. Plona has advised that she did not realize that the Protective Devices Schedule and Protective Devices Endorsement were in the policy quote and the policy, but that in the future, she's "going to start looking for it [*sic*]."

5. Ms. Plona has further advised that, if she had realized the Protective Devices Schedule and Protective Devices Endorsement were in the policy, the broker would have told your client, "Put up a fence, or you won't get insurance."

6. Ms. Plona further advised that, with regard to different underwriting conditions for a policy's placement, they "do that all the time – if an underwriter says this is what you need to do, then we tell the client this is what you need to do, and then they do it."

If I do not talk to you beforehand, have a nice Thanksgiving.

Bill

**William M. Harter**
**Attorney at Law** | **Frost Brown Todd LLC**
614.559.7226 Direct
614.323.5190 Mobile
wharter@fbtlaw.com

---

**From:** Zachary Gottesman <zg@zgottesmanlaw.com>
**Sent:** Monday, November 22, 2021 10:28 AM
**To:** Harter, William M. <wharter@fbtlaw.com>
**Cc:** Tom B. Bruns <tbruns@bcvalaw.com>
**Subject:** Re: 3371 Reading, LLC v. Liberty Mutual Insurance Company

Bill,

In your email below, you indicated Liberty should have issued a decision last week. There has been no substantive response to my Oct. 22, 2021 correspondence.

I am filing suit on behalf of the insured this week.

Zachary Gottesman, Esq.
Gottesman & Associates, LLC
404 East 12th Street
First Floor
Cincinnati, Ohio 45202
Tele: 513/651-2121
Fax: 513/586-0655
Mobile: 513/225-8997
zg@zgottesmanlaw.com

The preceding information is from the law firm of Gottesman & Associates, LLC, and may be protected by attorney/client privilege. If you believe it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error, then delete the message. Do not retain a copy. Thank you.

On Nov 11, 2021, at 7:29 AM, Harter, William M. <wharter@fbtlaw.com> wrote:

Zach –

I assume you received my out-of-office on the below email. My understanding is that Liberty's underwriting group is reviewing your letter and there should be a decision next week. If that decision is relayed to me before you, I will pass on the same to you and Tom.

Thanks.

Bill

William M. Harter
Attorney at Law | Frost Brown Todd LLC
614.559.7226 Direct
614.323.5190 Mobile

wharter@fbtlaw.com

---

**From:** Zachary Gottesman <zg@zgottesmanlaw.com>
**Sent:** Tuesday, November 9, 2021 1:13 PM
**To:** Harter, William M. <wharter@fbtlaw.com>
**Cc:** Tom B. Bruns <tbruns@bcvalaw.com>
**Subject:** 3371 Reading, LLC v. Liberty Mutual Insurance Company

Bill,

I called yesterday around 5 and left a voicemail. I called today at 1 and left a voicemail. Both voicemails were on your office line. Both times, I asked whether Liberty Mutual intended to respond and fi so when.

So far, I've not received a response.

Kind regards,

Zachary Gottesman, Esq.
Gottesman & Associates, LLC
404 East 12th Street
First Floor
Cincinnati, Ohio 45202
Tele: 513/651-2121
Fax: 513/586-0655
Mobile: 513/225-8997
zg@zgottesmanlaw.com

The preceding information is from the law firm of Gottesman & Associates, LLC, and may be protected by attorney/client privilege. If you believe it has been sent to you in error, do not read it. Please reply to the sender that you have received the message in error, then delete the message. Do not retain a copy. Thank you.

---

NOTICE: This electronic mail transmission is for the use of the named individual or entity to which it is directed and may contain information that is privileged or confidential. It is not to be transmitted to or received by anyone other than the named addressee (or a person authorized to deliver it to the named addressee). It is not to be copied or forwarded to any unauthorized persons. If you have received this electronic mail transmission in error, delete it from your system without copying or forwarding it, and

notify the sender of the error by replying via email or by calling Frost Brown Todd LLC at (513) 651-6800, so that our address record can be corrected.

# FANON RUCKER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**December 25, 2021 06:36 AM**
**FANON RUCKER**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1142484**

**3371 READING LLC** **A 2104408**

**vs.**

**LIBERTY MUTUAL GROUP INC**

**FILING TYPE: CLASSIFICATION**

**PAGES FILED: 1**

EFR200

| | | |
|---|---|---|
| COURT OF COMMON PLEAS<br>HAMILTON COUNTY, OHIO | CLASSIFICATION FORM<br><br>WWW.COURTCLERK.ORG | AFTAB PUREVAL<br>CLERK OF COURTS |

**CASE NUMBER:__________________PLAINTIFF: ________________________________________________**

**PURSUANT TO SUPERINTENDENCE RULE 4, THIS CASE WAS ORIGINALLY FILED AND DISMISSED**

**UNDER CASE NUMBER:__________________BY JUDGE __________________________________________**

## PLEASE INDICATE CLASSIFICATION INTO WHICH THIS CASE FALLS (please only check one):

[ ] Other Tort – C360
] Personal Injury – C310
] Wrongful Death – C320
] Vehicle Accident – C370

[ ] Professional Tort – A300
] Personal Injury – A310
] Wrongful Death – A320
] Legal Malpractice – A330
] Medical Malpractice – A340

[ ] Product Liability – B350
] Personal Injury – B310
] Wrongful Death – B320

] Worker's Compensation
Non-Compliant Employer – D410
~ Appeal – D420

] Administrative Appeals – F600
Appeal Civil Service – F610
~ Appeal Motor Vehicle – F620
~ Appeal Unemployment – F630
~ Appeal Liquor – F640
Appeal Taxes – F650
Appeal Zoning – F660

[ ] Certificate of Qualification – H600

[ ] Other Civil – H700-34
] Appropriation – H710
] Accounting – H720
] Beyond Jurisdiction –730
] Breach of Contract – 740
] Cancel Land Contract – 750
] Change of Venue – H760
] Class Action – H770
] Convey Declared Void – H780
] Declaratory Judgment – H790
] Discharge Mechanics Lien – H800
] Dissolve Partnership – H810
] CONSUMER SALES ACT (1345 ORC) – H820
] Check here if relief includes declaratory judgment, injunction or class action recovery – H825
] Habeas Corpus – H830
] Injunction – H840
] Mandamus – H850
] On Account – H860
] Partition – H870
] Quiet Title – H880
] Replevin – H890
] Sale of Real Estate – H900
] Specific Performance – 910
] Restraining Order – H920
] Testimony – H930-21
] Environmental – H940
] Cognovit – H950
] Menacing by Stalking – H960
] Repo Title – Transfer of Title Only –970
Court Ordered Title – H980
Injunction Sexual Predator – 990
] SB 10 – Termination – H690
] SB 10 – Reclassification – H697

**DATE:______________________** **ATTORNEY (PRINT): ________________________________________**

**OHIO SUPREME COURT NUMBER: ____________________________**

Revised 05/03/2021

# FANON RUCKER
# HAMILTON COUNTY CLERK OF COURTS

## COMMON PLEAS DIVISION

**ELECTRONICALLY FILED**
**December 25, 2021 06:36 AM**
**FANON RUCKER**
**Clerk of Courts**
**Hamilton County, Ohio**
**CONFIRMATION 1142484**

**3371 READING LLC** **A 2104408**

**vs.**

**LIBERTY MUTUAL GROUP INC**

## FILING TYPE: NOTIFICATION FORM

## PAGES FILED: 1

EFR200

**Aftab Pureval, Clerk of Courts**
**Court of Common Pleas, Hamilton County, Ohio**
**www.courtclerk.org**

# NOTIFICATION FORM

## CASE INFORMATION

**Date:** ______________________________

**Case No.:** ___________________________

**Caption:** ___________________________ **vs** ______________________________

************************************************************

## ATTORNEY INFORMATION

**Attorney Name:** ______________________________________________

**Attorney Address:** ______________________________________
**Firm**

______________________________________
**Street Number**

______________________________________
**City, State, Zip**

______________________________________
**Phone Number**

______________________________________
**Fax Number**

______________________________________
**E-Mail Address**

**Ohio Attorney Supreme Court No.:** ______________________________

☐ **Address Change Only**

☐ **Request Case Notification / Not a Party Defendant**

************************************************************

## COURT PARTY INFORMATION

**Name of Client:** ________________________________ ☐ **Plaintiff** ☐ **Defendant**

**Name of Client:** ________________________________ ☐ **Plaintiff** ☐ **Defendant**

**Name of Client:** ________________________________ ☐ **Plaintiff** ☐ **Defendant**

**Name of Client:** ________________________________ ☐ **Plaintiff** ☐ **Defendant**

**Name of Client:** ________________________________ ☐ **Plaintiff** ☐ **Defendant**

**Substituted for:**____________________________________________**(if applicable)**

**Rev. 08/03/2017**

**COMMON PLEAS COURT**
**HAMILTON COUNTY, OHIO**

3371 Reading, LLC

CASE NO. A2104408

VS

Liberty Mutual Group, Inc.

**DOCUMENT TO BE SERVED & ITS FILED DATE**

Complaint with Jury Demand filed 12/25/21

**PLAINTIFF/DEFENDANT REQUESTS:**

- [x] CERTIFIED MAIL SERVICE
- [ ] EXPRESS MAIL SERVICE
- [ ] PERSONAL SERVICE
- [ ] REGULAR MAIL SERVICE
- [ ] PROCESS SERVICE
- [ ] RESIDENCE SERVICE
- [ ] REGISTERED INTERNATIONAL
- [ ] FOREIGN SHERIFF

**ON:**

1) Liberty Mutual Group, Inc.
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215

2) The Ohio Casualty Insurance Company
c/o Corporation Service Company
50 West Broad Street, Suite 1330
Columbus, Ohio 43215

3)

4)

Zachary Gottesman
**ATTORNEY**

513/651-2121
**PHONE NUMBER**

404 East 12th Street, Cincinnati, Ohio 45202
**ADDRESS**

0058675
**ATTORNEY NUMBER**

Revised 9-18-18

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

3371 READING LLC
**PLAINTIFF**

Use below number on
all future pleadings

-- vs --

No. A 2104408
SUMMONS

LIBERTY MUTUAL GROUP INC
**DEFENDANT**

THE OHIO CASUALTY INSURANCE COMPANY
CORPORATION SERVICE COMPANY D - 2
50 WEST BROAD STREET SUITE 1330
COLUMBUS OH 43215

You are notified
that you have been named Defendant(s) in a complaint filed by

3371 READING LLC
CO GOTTESMAN & ASSOCIATES LLC
404 EAST 12TH STREET FIRST FLOOR
CINCINNATI OH 45202

Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**PAVAN PARIKH, 1000 MAIN STREET ROOM 315,**
**CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he/she has no attorney of record, a copy of an answer to the complaint within twenty-eight (28) days after service of this summons on you, exclusive of the day of service. Your answer must be filed with the Court within three (3) days after the service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered against you for the relief demanded in the attached complaint.

Name and Address of attorney
ZACHARY GOTTESMAN
404 EAST 12TH ST
FIRST FLOOR
CINCINNATI OH 45202

PAVAN PARIKH
Clerk, Court of Common Pleas
Hamilton County, Ohio

By RICK HOFMANN
Deputy

Date: January 7, 2022

D133822483

COURT OF COMMON PLEAS
HAMILTON COUNTY, OHIO

3371 READING LLC
**PLAINTIFF**

Use below number on
all future pleadings

-- vs --

No. A 2104408
SUMMONS

LIBERTY MUTUAL GROUP INC
**DEFENDANT**

LIBERTY MUTUAL GROUP INC
CORPORATION SERVICE COMPANY D - 1
50 WEST BROAD STREET SUITE 1330
COLUMBUS OH 43215

You are notified
that you have been named Defendant(s) in a complaint filed by

3371 READING LLC
CO GOTTESMAN & ASSOCIATES LLC
404 EAST 12TH STREET FIRST FLOOR
CINCINNATI OH 45202

Plaintiff(s)

in the Hamilton County, COMMON PLEAS CIVIL Division,
**PAVAN PARIKH, 1000 MAIN STREET ROOM 315,**
**CINCINNATI, OH 45202.**
You are hereby summoned and required to serve upon the plaintiff's attorney, or upon the plaintiff, if he/she has no attorney of record, a copy of an answer to the complaint within twenty-eight (28) days after service of this summons on you, exclusive of the day of service. Your answer must be filed with the Court within three (3) days after the service of a copy of the answer on the plaintiff's attorney.

Further, pursuant to Local Rule 10 of Hamilton County, you are also required to file a Notification Form to receive notice of all future hearings.

If you fail to appear and defend, judgement by default will be rendered against you for the relief demanded in the attached complaint.

Name and Address of attorney
ZACHARY GOTTESMAN
404 EAST 12TH ST
FIRST FLOOR
CINCINNATI OH 45202

PAVAN PARIKH
Clerk, Court of Common Pleas
Hamilton County, Ohio

By RICK HOFMANN
Deputy

Date: January 7, 2022

D133822487