**IN THE UNITED STATES DISTRICT COURT**

**FOR THE SOUTHERN DISTRICT OF OHIO (Cincinnati Division)**

| | | |
|---|---|---|
| **3371 Reading, LLC,**<br><br>Plaintiff,<br><br>v.<br><br>**Liberty Mutual Group, Inc.**<br>c/o Corporation Service Company<br>50 West Broad Street, Suite 1330<br>Columbus, Ohio 43215,<br><br>and<br><br>**The Ohio Casualty Insurance Company**,<br>c/o Corporation Service Company<br>50 West Broad Street, Suite 1330<br>Columbus, Ohio 43215<br><br>and<br><br>**Jonathan Jones**<br>c/o William Harter<br>One Columbus Center<br>10 West Broad Street, Suite 2300<br>Columbus, OH 43215-3484<br><br>Defendants. | :<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: | Case No. 1:22-cv-00062<br><br>**AMENDED COMPLAINT WITH JURY DEMAND ENDORSED HEREON** |

Plaintiff, by and through counsel, for its Amended Complaint against Defendants states as follows:

**Parties**

1. Plaintiff, 3371 Reading, LLC ("Plaintiff" and/or "Reading"), is an Ohio limited liability company that owned the real property located at 3371 Reading Road (the "Property") in Hamilton County, Cincinnati, Ohio, and has held an insurable interest in the Property at all times relevant to the allegations herein.

2. Defendant, Liberty Mutual Group, Inc. ("Liberty"), is a Massachusetts corporation that underwrote the coverage, insured the Property and/or adjusted the insurance claim at issue including, but not limited to, denying the claim in bad faith.

3. Defendant, The Ohio Casualty Insurance Company ("Ohio Casualty"), is an Ohio corporation that underwrote the coverage, insured the Property and/or adjusted the insurance claim at issue including, but not limited to, denying the claim in bad faith. Collectively, Liberty and Ohio Casualty are denoted as ("Defendants").

4. Defendant, Jonathan Jones ("Jones"), is a resident of Colorado and previously was a resident of Indiana who, at all times relevant hereto, was an underwriter employed by Liberty and who performed certain underwriting on behalf of Ohio Casualty.

**Jurisdiction & Venue**

5. Venue is proper in this Court pursuant to 28 U.S. Code § 1391 because all the defendants conducted activity that gave rise to the claims for relief in this county and the Property that is the subject of this action is located in this county.

6. This Court has personal jurisdiction over all the defendants pursuant to R.C. §2307.382 because they transacted business in Ohio, and they caused tortious injury in Ohio.

7. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1441 and 28 U.S.C. § 1332.

**Facts**

8. The Property, which contained a vacant building, was acquired by Reading on May 4, 2020.

9. In anticipation of renovating the building, Reading took steps to obtain an Inland Marine Insurance Policy with Builders' Risk coverage (Policy No. BMO 62480292) (the "Policy") through Camargo Insurance Company, Inc., ("Camargo").

10. Camargo is an insurance agency with which Reading had a longstanding relationship, and which had procured numerous similar policies from Defendants and on behalf of entities associated with Reading.

11. Liberty and Ohio Casualty's underwriter, Jones, was assigned and authorized to do the underwriting for the Policy. This process was controlled entirely by Defendants and their authorized agent, Jones. Jones' job duties also included sales and marketing related to placing insurance policies.

12. As a part of the underwriting on the Policy, Jones relied upon a questionnaire completed by Plaintiff and Camargo, which he acknowledged was filled out accurately.

13. As a further part of the underwriting process, Jones, on behalf of Liberty and Ohio Casualty, knew that the property, where the construction was going to occur, was located at 3371 Reading Road, Cincinnati, Ohio. Jones knew that the construction was going to involve masonry, that the value of the completed project was going to be $1,150,000, and that the building was an existing building originally constructed in 1926. Jones knew that the project involved rehabbing an apartment building, and he knew that the Property was vacant at the time. Jones also knew the building was 3 stories tall, with 13,291 square feet.

14. In the underwriting questionnaire, Defendants and Jones inquired about "security" at the Property and were informed by Plaintiff and Camargo that: "Building Secured." This was the one and only question Defendants and Jones asked in the underwriting process about security at the jobsite. The response of "Building Secured" was a true statement and Defendants do not

dispute it. In fact, Defendants admit the building was secure at the time of the loss, because of brick walls and locked windows and doors, despite the absence of a separate, 6' high fence completely surrounding the jobsite on the date of loss. Regardless, while Jones, acting on behalf of Liberty and Ohio Casualty, could have asked other questions about what "Building Secured" meant, he chose not to do so.

15. On December 11, 2020, Jones communicated with Camargo, and asked four additional questions prior to pricing the Policy, because, on behalf of Defendants, he had already decided to cover the risk. Jones could have asked more questions than those four, but decided not to. He learned through the responses to these additional four questions that Reading was a subsidiary of a larger company, that these companies had a common interest in insuring the risk, and that the property previously was covered by a policy issued by Westfield. Jones also knew that any coverage he permitted to be bound would be retroactive to December 10, 2020.

16. Camargo informed Jones that the amount of premium was not an issue, and that obtaining coverage was extraordinarily important. Additional follow-up occurred by Jones with respect to vetting Reading, which Jones ultimately did to his and Defendants' satisfaction.

17. As a further part of the underwriting on the Policy, Jones ran a "Risk Meter" report on the Property to obtain a third-party assessment of risk.

18. As a further part of the underwriting on the Policy, Jones also accessed satellite views/maps of the Property which revealed that the building on the Property was connected to another building on the south side of the property line (with which it shared a common wall) and also revealed that the front/east side of the building bordered the public sidewalk. Consequently, Jones knew at the time he assembled the Policy, and certainly before he gave permission to Camargo to bind the Policy he assembled, that it was impossible for Plaintiff to place and/or

maintain a separate, 6' high fence that completely surrounded the jobsite, particularly a fence that Plaintiff controlled, as Jones had defined "jobsite" to be the entire address of 3371 Reading Road.

19. Jones, who had the authority to do so, was responsible for assembling the Policy on behalf of Liberty and Ohio Casualty, including selecting the coverage forms and all endorsements. Jones, on behalf of Defendants and with authority from Defendants, then did so for the Policy.

20. The coverage forms Jones selected provided coverage for listed perils, allegedly including fire and theft coverage, for the entire building on an actual cash value basis. This representation was communicated to Reading on December 14, 2020.

21. The Policy Jones, on behalf of Defendants, underwrote, assembled, priced and gave permission to bind had an inception date of December 10, 2020. Jones gave Camargo authority and permission to bind coverage, on behalf of Liberty and Ohio Casualty, which occurred on December 14, 2020. A true and accurate copy of the Policy of insurance that Jones, on behalf of and with authority from Defendants, drafted, assembled, underwrote, priced and issued, and communicated to Plaintiff, through its agent, Camargo, on December 14, 2020,[1] is attached hereto as **Exhibit 1**.

22. In conducting the underwriting and assembling the Policy as described above, and thus knowing that it was impossible for Reading to place or maintain a separate, 6' high fence, that Reading controlled, completely surrounding the jobsite, Jones added an exclusion, labeled as a protective devices endorsement and/or schedule, to the Policy. In adding the protective devices

---

[1] Camargo communicated the Policy to the Reading on December 16, 2020, at 8:59 a.m. via email; the communication of the Policy and its terms to Camargo from Defendants occurred at 2:37 p.m. on December 14, 2020, via email between Camargo and Liberty and Ohio Casualty, by and through Jonathan Jones.

endorsement and/or schedule to the Policy, Jones knew that the language of the endorsement and/or schedule made it impossible for there ever to be any fire or theft coverage on the Policy. To be clear, Jones, on behalf of and with authority from Defendants, drafted and had the sole ability to determine the terms of the Policy. Jones, on behalf of and with authority from Defendants, decided what definitions to include and which to omit. Among terms that Jones and Defendants chose not to define in the Policy were "control", "fence," "maintain," and "gate" or "gated." But Jones and Defendants did define "fenced job site," as "a fence not less than 6 feet in height that completely surrounds the job site," and they defined "jobsite" as the entire address, i.e.: "3371 Reading Road."

23. Under Jones' and Defendants' interpretation of the Policy at the time Jones, on behalf of and with authority from Defendants, underwrote, assembled, priced and gave permission to bind the Policy and transmitted the Policy to Reading, the Policy could never provide any fire or theft coverage under any circumstance because it was impossible to maintain a separate, 6' high fence, under the control of Reading, completely surrounding the entire address of 3371 Reading Road. .

24. At the same time as described in Paragraph 23, above, and because he selected the particular policy forms, Jones also knew that the protective devices endorsement only applied to properties listed on the endorsement, and Jones failed to list any such properties on that endorsement. Jones and Defendants also knew that when it came to any claim initially falling within the terms of any coverage, unless a clear and unambiguous exclusion applied, which Defendants had the burden of demonstrating, then coverage would be owed.

25. As to his underwriting efforts on behalf of and with full authority from Defendants, Jones provided the following binding FRCP 30(b)(6) testimony on behalf of Defendants:

**Q. … And so this exclusion, assuming this exclusion is on the policy, it is Liberty Mutual -- or it's Ohio Casualty's position that Ohio Casualty will never pay for a fire loss if the insured fails to maintain in complete working order a 6 foot high fence completely surrounding the job site which the named -- a fence which the named insured controls –**

A. Yes.

**Q. -- right? That's Liberty -- that's Ohio Casualty's coverage and Liberty Mutual's coverage position, right?**

A. Yes.

**Q. So if there is no 6 foot high fence completely surrounding the job site, then it is Ohio Casualty's position there is never any fire coverage or theft coverage on this policy?**

A. Yes.

26. Thus, Defendants admit they knew, at the time that Jones, on behalf of and with full authority from Liberty and Ohio Casualty, underwrote, assembled, priced, and gave permission to bind the Policy, and transmitted the Policy to Reading on December 14, 2020, that Liberty and Ohio Casualty had no intention of ever paying any fire or theft claim under the Policy. Even though the Policy purportedly contained fire and theft coverage for the Property, Defendants knew their promises of fire and theft coverage were entirely illusory. These promises/statements by Defendants were knowingly false and material at the time they were made, and these promises/statements were made by Defendants with the intention that Reading would rely upon them. And in fact, Reading never would have purchased the Policy if it knew Defendants took the position they did as described above, because if Reading had known how Defendants interpreted the language of the Policy they sold to Reading, Reading would have purchased insurance coverage, including fire coverage, from another insurance carrier.

27. As a consequence of the foregoing, Reading justifiably relied upon the promise of insurance coverage, particularly fire and theft coverage, within the Policy made by Defendants on

December 14, 2020, and as a consequence Reading paid the full premium due and owing. Plaintiff further justifiably relied upon the promise of fire and theft coverage made by Defendants on December 14, 2020, by commencing renovation work and placing materials upon the Property to complete that renovation work over the course of the next nine months.

28. The Property contained a building comprised of vacant apartments. The building contained four brick walls, one of which was a common wall with an adjacent property, and all such brick walls exceeded six feet in height. During non-working hours, the building, including its doors and windows, was locked and secured.

29. The building on the Property extended to the property line on 3 sides. The building was abutted on the south side by another building, on the east side by a public sidewalk, and on the north side by a property owned by a third-party. As a result, it was not possible to place or maintain a fence (if the walls of the building itself did not constitute a "fence," where Defendants acknowledge "fence" is synonymous with "barrier") completely surrounding the jobsite.

30. On August 6, 2021, when the Policy was in full force and effect, but not during work hours, there was a fire at the Property that completely destroyed the building. Neither Reading nor its agents had anything to do with causing the fire, and there is no evidence the fire was due to arson.

31. The Cincinnati Fire Department did a cause and origin investigation that was inconclusive. The cause and origin of the fire remain undetermined. The building was a total loss, valued at more than $1,150,000, and it was razed with the permission of the City of Cincinnati and of Defendants.

32. Pursuant to certain terms and conditions of the Policy, Plaintiff timely submitted to Liberty and Ohio Casualty a properly supported claim for its loss and fully cooperated with every proper request made to it by Liberty and Ohio Casualty.

33. From June of 2019 through the date of loss, Camargo, on behalf of various entities related to Reading, applied to Liberty and Ohio Casualty for policies of Inland Marine Insurance Coverage, including Builders' Risk Coverage, approximately 22 times.

34. Out of 22 policies, the Policy (Policy No. BMO62480292) was the only policy to include the "Protective Devices Schedule" and "Protective Devices Endorsement" improperly relied upon by Defendants as their stated basis for denying coverage in this instance.

35. When Camargo applied for these policies online, neither the "Protective Device Schedule" nor the "Protective Devices Endorsement" were even available as endorsements under the "Mandatory Forms" or "Optional Forms" input menus. And, the clearly established course of dealing was not to include a "Protective Devices Schedule" and "Protective Devices Endorsement" in a policy obtained by Camargo. Instead, Libert and Ohio Casualty's underwriter, Jones, added these provisions without any request by either Camargo or Reading.

36. There was nothing in the online application process that asked about the presence of, or even the possibility of installing, fencing around the building and/or the jobsite. Instead, the online application included one simple question: "Please describe the security measures at insured's yard and jobsites"; to which Camargo responded: "Building Secured".

37. This omission by Defendants is crucial because had the issue been raised during the underwriting process, which Defendants entirely controlled, Camargo, on behalf of Reading, would have informed Defendants that the building and/or jobsite could not be fenced (except by the four walls of the building itself). As explained above, the insured building was abutted on the

south side by another building, on the east side by a public sidewalk, and on the north side by property owned by a third party. This rendered it impossible to erect "a fence, not less than six (6) feet in height, controlled by Reading, that completely surrounds the jobsite, with no openings unless gated," except, again, for the four walls of the building itself.

38. The specific language of the Policy upon which Defendants rely in this case is set forth in two separate portions of the Policy. The first portion is the Protective Devices Schedule which provides:

**IM 7904 04 04 Protective Devices Schedule**

AAIS
IM 7904 04 04
Page 1 0f 1

This endorsement changes
the Inland Marine Coverage
-- PLEASE READ THIS CAREFULLY --

---

PROTECTIVEDEVICESSCHEDULE

---

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours

IM 7904 04 04 Copyright, American Association of Insurance Services, Inc. 2004

And the second is the "Protective Devices Endorsement" which provides:

**IM 7853 04 04 Protective Devices Endorsement**

AAIS
IM 7853 04 04

This endorsement changes
the Inland Marine Coverage
- PLEASE READ IT CAREFULLY -

PROTECTIVEDEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

---

OTHER CONDITIONS

---

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

---

PERILS EXCLUDED

---

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

39. Reading submitted a claim for the full limit of the proceeds of the Policy to the Defendants, to which it was entitled under R.C. 3929.25. Plaintiff fully cooperated in Defendants' investigation.

40. Liberty and Ohio Casualty conducted a one-sided investigation of the claim, not looking for coverage as their duty of good faith required but, instead, looking for ways to deny the claim. Nevertheless, Liberty and Ohio Casualty agreed that separate fencing, controlled by Reading, and completely surrounding the building and/or the job site, was an impossibility and that the Policy provided illusory fire and theft coverage. Yet, Liberty and Ohio Casualty wrongfully persisted in their denial. In fact, Liberty and Ohio Casualty wrongfully and without reasonable justification denied coverage for the loss on the basis that "No fencing was placed around the jobsite as required by the Protective Devices Endorsement on the policy." See the correspondence attached hereto as **Exhibit 2** and incorporated herein by reference. In fact, Liberty

and Ohio Casualty admit there is no language in the Policy requiring Reading to "place" a fence completely surrounding the jobsite.

41. On Oct. 22, 2021, Reading, through counsel, sent a letter to Liberty and Ohio Casualty explaining in detail how Liberty and Ohio Casualty's wrongful denial of Reading's claim had no reasonable basis in law or in fact, and was otherwise improper and in bad faith, because Liberty and Ohio Casualty's coverage analysis was legally and factually unsupported. See the correspondence attached hereto as **Exhibit 3** and incorporated herein by reference. In an effort at mitigating its damages, Reading also made it clear in the letter that since the date of the fire, it already suffered additional damages due to Liberty and Ohio Casualty's bad faith denial, and that it would continue to suffer such damages unless Liberty and Ohio Casualty timely reconsidered their bad faith denial.

42. With full knowledge of what was at stake, Liberty and Ohio Casualty continued to take an unreasonable amount of time to respond to Reading, finally doing so on Nov. 23, 2021. Defendants' response, conveyed in an email by Attorney Bill Harter of Frost, Brown Todd, LLC., as agent and representative for Liberty and Ohio Casualty, continued to deny coverage for the loss despite the total lack of any reasonable legal or factual justification for the denial. Specifically, in Attorney Harter's email, Liberty and Ohio Casualty raised irrelevant facts, misrepresented facts, and utterly failed to address the points of law, facts and arguments laid out in the Oct. 22, 2021, letter. See the Harter email attached hereto as **Exhibit 4** and incorporated herein by reference.

43. Attorney Harter had been hired by Liberty and Ohio Casualty to look into Liberty and Ohio Casualty's bad faith denial of coverage and, at Liberty and Ohio Casualty's request, became Reading's point of contact with Liberty and Ohio Casualty for this claim. Attorney Harter, as agent and representative for Liberty and Ohio Casualty, further contributed to Liberty and Ohio

Casualty's bad faith acts by unreasonably failing to address the legal and factual arguments contained in the Oct. 22, 2021 letter. These, and all of the above actions by or on behalf of Liberty and Ohio Casualty were done with full knowledge of the damage accruing to Reading, and were done deliberately with the intent of forcing Reading to litigate in Court or abandon its claim.

44. Attorney Bill Harter is a material witness to the facts underlying the claims set forth herein.

45. Liberty and Ohio Casualty, despite their ongoing duty of good faith and fair dealing, continue in their bad faith refusal to pay Reading's claim despite a clear legal duty to do so. That bad faith refusal persists to the present and includes, but is not limited to, the act of hiring a bad faith expert who opined, without any legal or factual basis, that an insured forfeits its right to coverage if the insured and its agent fail to read the policy when issued.

46. As a direct and proximate result of Liberty and Ohio Casualty's ongoing tortious and bad faith refusal to pay Reading's claim for the fire loss at the Property, Reading has suffered, is suffering and will suffer in the future compensatory damages in the form of lost business, loss rental income, loss of investor revenue and related profits, and other damages to be proven at trial.

47. Even if the specific endorsements relied upon by Liberty and Ohio Casualty actually applied to the facts of this loss, which by Liberty and Ohio Casualty's own admission they do not, Liberty and Ohio Casualty's reliance on terms and/or exclusions requiring separate fencing completely surrounding the building/jobsite, and under the control of Reading, rendered illusory any fire and theft coverage provided by the Policy. As such, the contract at issue should be reformed due to mutual mistake of fact, to eliminate the problematic endorsements.

**First Cause of Action – Breach of Contract/Reformation (against Defendants Liberty Mutual and Ohio Casualty)**

48. Reading incorporates the preceding allegations by reference.

49. The Policy provides: "If indicated on the Protective Devices Schedule, the following conditions apply to the locations on the schedule." The above-quoted language is taken directly and verbatim from the "Protective Devices Endorsement." To Reading, and anyone else reasonably reading the above language, the word "schedule" at the end of the sentence would be understood to refer to the "Protective Devices Schedule" referenced at the beginning of the sentence. However, there are no "locations" listed, indicated, or referenced on the "Protective Devices Schedule", and Defendants admit this. Therefore, there is no good faith basis to say that the "Protective Devices Endorsement" applies to the facts of this loss, and such endorsement must otherwise be strictly construed against Defendants.

50. The Policy also provides: "Protective Devices – 'You' are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule." Again, the above-quoted language is taken directly and verbatim from the "Protective Devices Endorsement." Defendants chose not to define the word "maintain". However, to Plaintiff, and anyone else reading the above language, the word "maintain" is both clear and unambiguous in requiring an insured to maintain only that which already is in place. In fact, the Merriam-Webster dictionary definition of the word "maintain" is "to keep in an existing state (as of repair, efficiency, or validity): preserve from failure or decline, maintain machinery." Specifically, it does not mean "to place or erect or install" in the first instance. Therefore, even if Defendants' alleged interpretation of this language is a reasonable interpretation, this language must be construed strictly against Defendants, who chose this language, to only include separate fencing that was present at the time the Policy was applied for (which is to say, no separate fencing at all in the present matter).

51. The impossibility of erecting a separate fence completely surrounding the building and/or jobsite, and controlled by Reading, as allegedly required by the "Protective Devices Schedule" renders illusory the fire and theft coverage contained in the Policy. No loss by theft or fire would ever be covered by the Policy as issued because the Insured, here Reading, could never comply with Defendants' interpretation of the "Protective Devices Schedule" and "Protective Devices Endorsement." An insurance provision is illusory when it appears to grant a benefit to the insured, although in reality, it does not. *Coleman v. Progressive Preferred Ins. Co.*, 1st Dist. No. C-070779, 2008 Ohio 3568, P13; *GenCorp., Inc. v. AIU Ins. Co.*, 104 F.Supp.2d 740, 745 (N.D. Ohio 2000). Courts ado not give insurance provisions a meaning that would render them illusory. *GNFH, Inc. v. W. Am. Ins. Co.*, 172 Ohio App.3d 127, 2007 Ohio 2722, P133, 873 N.E.2d 345; *Talbert v. Continental Cas. Co.*, 157 Ohio App. 3d 469, 2004 Ohio 2608, 811 N.E.2d 1169. Thus, the terms/exclusions at issue that Defendants rely upon must be interpreted so as to require coverage.

52. In this case, Defendants made no effort to prove or establish how the presence of a separate fence would have prevented the loss at issue, nor can they. In fact, Defendants admit they have no proof the presence of such a fence would have averted the loss. The cause of the fire is undetermined. As the party claiming an exclusion applies, Defendants must have some basis for claiming the presence of a separate fence surrounding the jobsite would have prevented the loss, or that the lack of a fence played some role in causing the loss. See *Praetorian Ins. Co. v. Axia Contr., LLC*, 794 Fed. Appx. 791 (10th Cir. 2019). (Court held the carrier could not rely on the "Protective Devices Schedule" and the "Protective Devices Endorsement" to avoid coverage after a fire where there was no evidence the insured's failure to maintain fencing caused or contributed to the loss.).

53. Defendants' improper denial of coverage was predicated on Defendants' interpretation of the term "fence" to mean a structure or device separate and apart from the building walls themselves. But, the actual terms of the policy merely contained the following language: "fence, not less than six (6) feet height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours." Defendants chose not to define their interpretation of the terms "fence" or "gate" or "gated" in the Policy.

54. A dictionary definition of the term "fence," means "a barrier intended to prevent escape or intrusion or to mark a boundary."[2] And the term "gate" is defined in the dictionary to mean "an opening in a wall or fence." The fact that the building itself was enclosed by four brick walls, all more than six feet in height, all enclosing the jobsite, all secured and locked, reasonably fulfills the meaning of the terms Defendants chose to employ and failed to define. In fact, Defendants agree this understanding of these undefined terms is a reasonable understanding of these terms. And, to the extent that Defendants intended any other meaning, the law is clear that these ambiguities are construed against the insurer and strictly in favor of the insured. *Bowling*, 149 Ohio App. 3d 290.

55. As a consequence of the foregoing, Liberty and Ohio Casualty underwrote, assembled and issued the Policy, either directly or as the Policy should be reformed due to mutual mistake; Plaintiff fully performed all acts required to trigger insurance coverage, including the timely payment of premiums, the timely presentment of a claim, notice to the insurer of the loss, and all other conditions precedent and subsequent to the payment of the claim; Liberty and Ohio Casualty breached this Policy, and Plaintiff has been harmed thereby for the total loss of the

[2] https://dictionary.findlaw.com/definition/fence.html

Property under R.C. 3929.25 in the amount of $1,150,000 or, if that statute does not apply, such other amount exceeding $25,000 to be proved at trial.

**Second Cause of Action – Bad Faith (against Defendants Liberty Mutual and Ohio Casualty)**

56. Reading incorporates the preceding allegations by reference.

57. Liberty and Ohio Casualty owe Reading an ongoing duty of good faith and fair dealing. Liberty and Ohio Casualty's refusal to pay Reading's fire claim for the total loss of the structure and renovations at the Property and/or Defendants' handling of the fire claim is tortious bad faith because Liberty and Ohio Casualty's acts and/or omissions complained of herein are not predicated upon circumstances that furnished reasonable justification therefore. Rather, Liberty and Ohio Casualty's acts and/or omissions complained of herein are predicated upon circumstances constituting malice, fraud and/or insult, making Liberty and Ohio Casualty liable for punitive damages, consequential damages and attorney fees.

58. Further, and/or in the alternative, Liberty and Ohio Casualty failed, and continue to fail, to exercise good faith in the processing of Reading's fire claim, where their refusal to pay the claim is not predicated upon circumstances that furnish reasonable justification therefor.

59. As a direct and proximate result of Liberty and Ohio Casualty's bad faith, Reading is suffering ongoing economic losses in an amount to be proven at trial in excess of $25,000.

60. Specifically, and at present, Liberty and Ohio Casualty's failure to pay the claim when and as due has caused approximately $7,000,000 in compensatory damages, to include lost revenue and rental income, lost ability to qualify for tax credits, lost realization of expected property sales revenue, lost accretion to value, and other foreseeable economic damages.

61. Defendants' actions herein constituted fraud and/or actual malice, as that term has been defined, warranting the imposition of punitive damages of twice the compensatory damages,

or approximately $14,000,000 and additionally attorney fees, expert witness fees, and litigation costs.

**Third Cause of Action – Fraud in the Inducement (against all Defendants)**

62. Reading incorporates the preceding allegations by reference.

63. On December 14, 2020, Defendants Liberty Mutual Group, Inc. and Ohio Casualty Company, by and through their representative, and with the authority of, by and through their duly authorized agent and employee Jones, and Defendants Jones personally, made material and false representations to Plaintiff, namely, the terms of the fire and theft coverage contained in the Policy, at **Exhibit 1**, and specifically the fact that the Policy allegedly provided fire and theft coverage on the Property. Specifically, and without limitation, the material and false representations made to Reading by Defendants included the following:

(i) That the policy was going to provide fire and theft coverage to 3371 Reading, LLC, for 3371 Reading Rd, Cincinnati, OH 45229-3171, for fire and theft losses during the policy period, as reflected on pages 3, 28-29, and 58 of the Policy;[3]

(ii) That the policy was going to provide fire and theft coverage in exchange for the paid premium, as reflected on pages 4 and 30 of the Policy;

(iii) That fire and theft coverage was provided for the scheduled jobsite with a building materials limit of $450,000 and a building limit of $700,000, as reflected on page 5 and 31 of the Policy;

(iv) That fire and theft coverage was provided for the existing building, as it then-existed, as reflected on pages 6 and 32 of the Policy;

(v) That there was a Protective Devices Endorsement stating that "if indicated on the Protective Devices Schedule" applied "to the locations described on the schedule". However, with no locations listed on the schedule on pages 8 and 9 and 35 and 36 of the Policy, the Protective Devices Endorsement did not apply at all;

---

[3] All referenced pages are those within Exhibit 1, i.e. page 3 is the third page from the front, with page 1 being the certification.

(vi) That "Liberty Mutual Insurance claims professionals across the United States are ready to resolve your claim quickly and fairly, so you and your team can focus on your business. Our claims teams are specialized, experienced and dedicated to a high standard of service," on page 16 of the Policy;

(vii) That coverage was provided for renovation and rehabilitation of the property, as provided on page 46 of the Policy;

(viii) That direct physical loss was covered and would be paid, as provided on page 50 of the Policy;

64. Defendants, by and through the actions of Jones acting on their behalf and with their authority, and Jones personally, communicated the foregoing representations to Camargo, as agent for Plaintiff, at approximately 2:37 p.m. on December 14, 2020, via email and then communicated the foregoing Policy terms through Liberty's online system immediately thereafter.

65. Camargo then communicated the Policy and the representations made by Defendants in Paragraph 63, to the Plaintiff on December 16, 2020, at 8:59 a.m. via email.

66. However, the foregoing material representations in Paragraph 63 included a knowingly false promise to pay fire and theft claims that came within the ambit of the terms of the Policy, because Defendants and Jones knew such coverage would never apply to any fire or theft loss at the Property, and Jones admitted that these were knowingly false promises to pay at the time the representations were made, as he admitted in testimony.

67. Defendants, Liberty Mutual Group, Inc. and Ohio Casualty Company, by and through their representatives, and with the authority of, by, and through their duly authorized agent and employee, Jones, and Jonathan Jones individually, knew that the foregoing statements and representations in the Policy and as outlined in the foregoing Paragraphs were false, or they made these statements with such utter disregard and recklessness as to whether they were true or false that knowledge may be inferred. They knew that they were false because Jones admitted as much in testimony on behalf of himself and as the FRCP 30(b)(6) witness for Defendants.

68. Defendants, Liberty Mutual Group, Inc. and Ohio Casualty Company and Jones, each intended that the foregoing statements and representations be relied upon, so that they could collect a premium and enrich themselves at the expense of Reading, and Jones additionally intended that the foregoing statements and representations be relied upon, so that a premium would be received that he would receive credit for selling the Policy. And Defendants, Liberty Mutual Group, Inc. and Ohio Casualty Company, collected that premium and retained that premium to date, all without disclosing that Defendants had issued a sham policy under which they never intended to pay any fire or theft loss to the Property.

69. Reading justifiably relied upon the statements and representations set forth herein, paid the premium when and as due, and further justifiably relied upon the statements and representations in commencing construction and work on the Property.

70. Reading has been proximately and actually injured by the foregoing, in that there was a total fire loss that Liberty and Ohio Casualty, in good faith, should have covered but failed to cover. But for the fraud, Reading would have obtained alternative coverage with another carrier that would have appropriately covered the loss. Plaintiff has suffered approximately $7,000,000 in compensatory damages, to include alternative coverage that would have been for a higher limit, lost revenue and rental income, lost ability to qualify for tax credits, lost realization of expected property sales revenue, lost accretion to value, and other foreseeable economic damages.

71. Defendants' actions herein constituted fraud and/or actual malice, as that term has been defined, warranting the imposition of punitive damages of twice the compensatory damages, or approximately $14,000,000, and additionally attorney fees, expert witness fees, and litigation costs.

**Fourth Cause of Action – Ohio Deceptive Trade Practices Act (against Defendants Liberty Mutual and Ohio Casualty)**

72. Reading incorporates the preceding allegations by reference.

73. Defendants Liberty and Ohio Casualty, by and through their agents (including but not limited to Jones), engaged in deceptive trade practices, in contravention of the Ohio Deceptive Trade Practices Act, R.C. 4165.01, et. seq. when, on or about December 14, 2020, and in the course of their respective businesses, they knowingly represented that goods or services, namely the Policy, had uses or benefits it did not have, and made the other false representations set forth herein such as the fact the Policy provided fire and theft coverage to the Property when Liberty and Ohio Casualty knew that the Policy would never, according to their interpretation, ever provide such coverage. Thus, Liberty and Ohio Casualty, admittedly, misrepresented that the Policy provided coverage and had "characteristics, … uses, [or] benefits … that [it does] not have," in contravention of R.C. 4165.02(7).

74. Reading justifiably relied upon the statements and representations set forth above, paid the premium when and as due, and further relied upon Liberty and Ohio Casualty's statements and representations in commencing construction and work on the Property.

75. Pursuant to R.C. 4165.03(A)(2), Reading is entitled to its actual damages for these violations, because it relied upon these false statements to its detriment. But for the deceptive trade practices, Reading would have obtained alternative coverage with another carrier that would have appropriately covered the loss. Plaintiff has suffered approximately $7,000,000 in compensatory damages, to include alternative coverage that would have been for a higher limit, lost revenue and rental income, lost ability to qualify for tax credits, lost realization of expected property sales revenue, lost accretion to value, and other foreseeable economic damages. Pursuant to R.C. 4165.03(B), Plaintiff is entitled to its reasonable attorney fees.

76. Liberty and Ohio Casualty's actions herein constituted fraud and/or actual malice, as that term has been defined, warranting the imposition of punitive damages of twice the compensatory damages, or approximately $14,000,000, and additionally attorney fees, expert witness fees, and litigation costs.

77. Pursuant to R.C. 4165.03(A), and in light of the policies and practices of Liberty and Ohio Casualty to deceptively sell insurance policies that provide no coverage, in addition to Reading and related entities practice of obtaining insurance in the Ohio insurance market, Reading is likely to be damaged by the deceptive trade practices of Liberty and Ohio Casualty, Reading seeks injunctive relief as permitted in that section, to include required additional disclosures and warnings of potential fraud, and other appropriate injunctive relief on any Liberty, or Liberty subsidiary, to include Ohio Casualty's insurance policies issued in Ohio or relating to property located in Ohio, for a period of between two to five years following the entry of injunctive relief.

WHEREFORE, Reading demands judgment against all defendants, jointly and severally, for compensatory, special, consequential, and punitive damages, appropriate injunctive relief, attorney's fees, expert witness fees, costs of this action, and such other relief as this Court deems just.

Respectfully submitted,

*/s/Zachary Gottesman*
Zachary Gottesman (0058675)
Trial Attorney for Plaintiff
Gottesman & Associates, LLC
404 East 12th Street, First Floor
Cincinnati, Ohio 45202
513/651-2121
zg@zgottesmanlaw.com

*/s/ Thomas B. Bruns*
Thomas B. Bruns (0051212)

Bruns, Connell, Vollmar & Armstrong, LLC
4750 Ashwood Drive, Suite 200
Cincinnati, OH 45241
(513) 312-9890
(513) 800-1263 (fax)
tbruns@bcvalaw.com

*/s/ Christopher Wiest*____________
Christopher Wiest (0077931)
Chris Wiest, Atty at Law, PLLC
50 E. Rivercenter Blvd., Ste. 1280
Covington, KY 41011
513/257-1895 (c)
859/495-0803 (f)
chris@cwiestlaw.com
*Counsel for the Plaintiff*

**Jury Demand**

The Plaintiff demands a trial by jury on all issues so triable.

*/s/ Christopher Wiest*____________
Christopher Wiest (0077931)

CERTIFICATE OF SERVICE

I certify that I have served a copy of the foregoing upon all Counsel of record, this 11 day of June, 2024, via filing same via CM/ECF.

*/s/ Christopher Wiest*____________
Christopher Wiest (0077931)