## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

| | | |
|---|---|---|
| **3371 READING, LLC,** | : | Case No. 1:22-cv-62 |
| | : | |
| *Plaintiff,* | : | Judge Jeffery P. Hopkins |
| | : | |
| vs. | : | |
| | : | |
| **LIBERTY MUTUAL GROUP, INC.**, *et* | : | |
| *al.*, | : | |
| | : | |
| *Defendants.* | : | |

## OPINION AND ORDER

The case now before the Court involves a dispute over insurance coverage. Plaintiff 3371 Reading, LLC ("3371 Reading" or "Plaintiff") sued Defendants The Ohio Casualty Insurance Company, Liberty Mutual Group, Inc., and Jonathan Jones (together "Ohio Casualty" or "Defendants") when coverage was denied after fire destroyed Plaintiff's building located at the 3371 Reading address (which also serves as the business's namesake). The parties filed cross-motions for summary judgment seeking a determination over whether 3371 Reading's builders' insurance policy covered the loss. Doc. 99, Doc. 105. Also before the Court are two motions to exclude testimony filed by Plaintiff (Docs. 103, 104) and a Motion for Leave to File Supplemental Response to Plaintiff's Motion for Partial Summary Judgment Instanter (Doc. 112) filed by Defendants.

At the core of the parties' dispute over insurance coverage is an endorsement contained in the insurance policy. That endorsement required 3371 Reading to maintain a fenced jobsite to recover on its insurance policy, which was placed with Ohio Casualty, an underwriting

company for Liberty Mutual. Defendants[1] contend that Ohio Casualty properly denied coverage because 3371 Reading failed to comply with the fenced jobsite requirement. As explained more fully, below, the Court agrees. Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 99) and **DENIES** 3371 Reading's Motion for Partial Summary Judgment (Doc. 105). Because the Court reaches this conclusion without relying on the testimony of the two contested expert witnesses, it need not reach 3371 Reading's Motions to Exclude (Docs. 103, 104), which are **DENIED AS MOOT**. Liberty Mutual's Motion for Leave to File Supplemental Response (Doc. 112) is also **DENIED AS MOOT**.[2]

## I. BACKGROUND

Stanislav Grinberg and Peter Gizunterman are real estate investors. Doc. 105-1, ¶¶ 1–3. They also are the sole members of two LLCs formed to purchase properties in Cincinnati for redevelopment: 4588, LLC and Vision & Beyond Group, LLC. *Id.*, ¶ 1-3. On May 1, 2020, 4588, LLC purchased the property at issue in this litigation, 3371 Reading Road. *Id.*, ¶ 1. Grinberg and Gizunterman bought the building at 3371 Reading Road as part of a larger acquisition of properties out of receivership in a Hamilton County Court of Common Pleas case, getting it for "dirt cheap," in their words. *Id.*, ¶¶ 1, 4. They planned to renovate the building, which had been an abandoned warehouse in a previous life and to convert it into a mixed-use building with apartments and commercial use space. Doc. 99, PageID 5417. Three days after they bought 3371 Reading, Grinberg and Gizunterman transferred it to another

---

[1] Defendants also argue that Liberty Mutual is not a proper defendant because it was not in privity with 3371 Reading. Doc. 99, PageID 5426 n.6. Because the Court concludes that Defendants were entitled to deny coverage under the policy, it need not address this argument.

[2] The Court heard oral argument from the parties on pending motions on April 1, 2025.

LLC wholly owned by the two of them, 3371 Reading, LLC, which is the plaintiff here. *See* Doc. 105-1, ¶ 2.

Thereafter, Plaintiff procured builder's risk insurance for the property at 3371 Reading through its insurance broker, Camargo Insurance Agency. Doc. 99, PageID 5417. Camargo principal Jacob Mueller and employee Lynn Plona worked with Ohio Casualty underwriter Jonathan Jones to place coverage for the property. *Id.* On December 14, 2020, Mr. Jones sent Camargo a proposal for the policy. *Id.* at PageID 5418. That December 14 proposal included the key provisions at issue in this case: a Protective Devices Schedule and a Protective Devices Endorsement, under the terms of which 3371 Reading would be required to put up a protective fence in order to receive coverage. *Id.* Ms. Plona would later tell Ohio Casualty's claims investigator that she never saw the Protective Devices Endorsement prior to 3371 Reading making a claim on its policy, but she also confirmed that she sent the complete policy, including the Protective Devices Endorsement and all other policy documents, to her contact person at Plaintiff's business establishment. *See id.* at PageID 5421–22. According to Mr. Mueller, no one at Camargo reviewed Ohio Casualty's proposal with Plaintiff. Doc. 109-1, ¶ 22. Indeed, no one at 3371 Reading appears to have been aware of the fencing requirement until Ohio Casualty raised it when investigating 3371 Reading's claim—when contacted by Ohio Casualty's investigator, Mr. Grinberg said he was not aware of any fencing requirement in the policy. Doc. 109-1, ¶ 51.

While it appears to not have reviewed the draft policy thoroughly, 3371 Reading purchased the builders' risk policy, bearing policy number BMO 62480292 and with an effective date of December 11, 2020 ("the Policy"). Doc. 99, PageID 5419. And by December 16, 2020, both Plaintiff and Camargo had received copies of the Policy. *Id.*

3

The Policy provided builders' risk coverage for the 3371 Reading Road site, with a building materials coverage limit of $450,000 and a building coverage limit of $700,000. Doc. 76-1. Included with the policy was a "General Endorsement" which included the Protective Devices Schedule and the Protective Devices Endorsement. Near the top of each page of the General Endorsement there was a notice that read: "*This Endorsement Changes The Policy. Please Read It Carefully.*" Doc. 76-1, PageID 3761–62 (emphasis added). The Protected Devices Schedule stated:

PROTECTIVE DEVICES SCHEDULE
_____

(The entries required to complete this schedule will be shown below or on the "schedule of coverages".)

Protective Device or Service

Fenced Jobsite. Fenced jobsite means a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours

Doc. 76-1, PageID 3761.

On the Policy's following page appears the Protective Devices Endorsement:

PROTECTIVE DEVICES ENDORSEMENT

If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule.

OTHER CONDITIONS

Protective Devices - "You" are required to maintain, at all times during the policy period, the protective devices and services described on the Protective Devices Schedule.

PERILS EXCLUDED

As respects the locations specified in the Protective Devices Schedule, the following exclusion is added to Perils Excluded:

"We" do not pay for loss caused by fire or theft if, prior to the fire or theft, "you":

1. had knowledge of any suspension or impairment in any protective device or service described on the Protective Devices Schedule and did not notify "us"; or

2. failed to maintain in complete working order, any protective device or service described on the Protective Devices Schedule which "you" control.

Doc. 76-1, PageID 3762.

These endorsements were included near the beginning of the policy, prior to various form documents.

With the Policy in place, Plaintiff began construction at the 3371 Reading job site, but never put up a construction fence around the property. Doc. 109-1, ¶ 31. Plaintiff also never applied for a permit to erect a construction fence on the city sidewalk abutting one side of the property. *Id.*, ¶ 33. Among the other miscues, Plaintiff never spoke with anyone at Ohio Casualty about the protective devices endorsement prior to the fire. *Id.*, ¶ 36.

On the evening of August 6, 2021, the building at 3371 Reading Road burned down. Doc. 108-1, ¶¶ 58–59.[3] The fire was so severe that the roof collapsed and the walls became

---

[3] Mr. Grinberg testified that the project was "fairly close to finished" at the time of the fire and required only about a month more work. Doc. 94-1, PageID 4549–50.

unstable, so the City of Cincinnati directed the building's owners to raze it. *Id.* The Cincinnati

Fire Department investigated the fire but was unable to determine its cause. *Id.*

3371 Reading notified Ohio Casualty and Liberty Mutual of the loss on August 9.

Doc. 52-2, PageID 2773. Liberty Mutual investigated the claim, and on September 30, 2021,

it issued a denial letter to Plaintiff informing the company that it had denied the claim. Doc.

109-1, ¶ 53. *See also* Doc. 52-2. That letter stated:

> No fencing was placed around the jobsite as required by the Protective Devices
> Endorsement on the policy. Based on the above we find no coverage under the terms
> and conditions of your policy for the costs claimed in connection with your asserted
> claim and therefore deny your claim.

Doc. 52-2.

 Plaintiff originally sued Liberty Mutual and Ohio Casualty in the Hamilton County

Court of Common Pleas on December 25, 2021, alleging breach of contract and bad faith

claim refusal. Doc. 1-2. Liberty Mutual and Ohio Casualty removed the case to federal court

in February of 2022. Doc. 1.[4] 3371 Reading later sought leave to amend the complaint,

seeking to add claims of fraud and violation of the Ohio Deceptive Trade Practices Act. Doc.

50. This Court granted Plaintiff's request to amend, Doc. 75, and Plaintiff filed its amended

complaint—which is the presently operative version of the complaint—on June 11, 2024.

Doc. 76. In turn, the parties filed the cross-motions for summary judgment presently under

consideration seeking a determination of whether the fire that destroyed the property at 3371

Reading Road was covered under the Policy and whether Ohio Casualty's denial of Plaintiff's

---

[4] When Ohio Casualty first removed this case, it was before Judge Timothy Black. It was transferred to Judge Matthew McFarland in August 2022, then to the undersigned in December 2022.

insurance claim was fraudulent, violated Ohio's Deceptive Trade Practices Act, and was done in bad faith. Docs. 99, 105.

## II.    STANDARD OF REVIEW

Ohio Casualty asks the Court to grant summary judgment rejecting all Plaintiff's claims for relief, while 3371 Reading seeks summary judgment on its contract claim and partial summary judgment on its remaining claims. The Court applies the same standard in evaluating each motion for summary judgment; each movant must "'inform[] the district court of the basis for its motion and identify[] those portions' of the record which demonstrate 'the absence of a genuine issue of material fact.'" *Rudolph v. Allstate Ins. Co.*, No. 2:18-cv-1743, 2020 WL 4530600, at *3 (S.D. Ohio Aug. 6, 2020) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

The non-moving party cannot defeat summary judgment merely by pointing to any factual dispute. Instead, the "mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Int'l Outdoor, Inc. v. City of Troy*, 974 F.3d 690, 697 (6th Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).  In other words, the dispute must be "genuine" (*i.e.*, supported by evidence) and go to a "material fact" (*i.e.*, a fact that could matter to the outcome).

In sum, after reviewing the cited evidence, the Court must determine whether there is some "sufficient disagreement" that necessitates submitting the matter to a jury.  *Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251). In making that determination, though, the Court must view the evidence in the light most favorable to the nonmoving party. *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995)

("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party."); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## III.    LAW AND ANALYSIS

3371 Reading and Ohio Casualty both ask the Court to interpret the disputed Policy provision and determine whether 3371 Reading is entitled to coverage under the insurance Policy. As counsel for the parties professed at oral argument in this matter, all parties agree that interpretation of the insurance contract is a matter of law, and so should be determined by this court on summary judgment. To put it another way, no party thinks the insurance coverage question should go to trial; both parties agree it should be decided by this Court on the briefing currently before it. The Court agrees and proceeds to interpret the Policy. *See Davis v. GEICO Cas. Co.*, 659 F. Supp. 3d 843, 852 (S.D. Ohio 2023) ("Interpretation of insurance contracts may be decided at summary judgment.")

### A. Choice of Law

First things first. The Court must determine what state's law to apply in interpreting the insurance policy. This Court has diversity jurisdiction over this dispute under 28 U.S.C. § 1332, as there is complete diversity between Plaintiff 3371 Reading and Defendants Ohio Casualty and Liberty Mutual. Doc. 1, PageID 1–2. In a diversity case, the Court applies the choice of law rules of the state in which it sits, which here is Ohio. *See Sec. Ins. Co. of Hartford v. Kevin Tucker & Assocs., Inc.*, 64 F.3d 1001, 1005 (6th Cir. 1995). In the absence of a choice-of-law provision in a contract, Ohio courts apply the law of the state that has the most significant relationship to the dispute. *See Gries Sports Enters., Inc. v. Modell*, 15 Ohio St. 3d 284, 287 (1984). Ohio has the most significant relationship to the contract, as the insured property

was located in Ohio and the insured was located in Ohio. Thus, Ohio law governs interpretation of the insurance policy.[5]

### B. Construction of an Insurance Contract

Under Ohio law, this Court is required to "'interpret the contract in such a way as to give effect to the intention of the parties at the time the agreement was entered into, as evidenced by the provisions of the contract.' . . . However, because it is typically the insurance carrier that drafts the policy, ambiguous language is construed in the way most favorable to the insured." *In re Buckeye Countrymark, Inc.*, 251 B.R. 835, 839 (Bankr. S.D. Ohio 2000) (*quoting Watkins v. Brown*, 97 Ohio App.3d 160, 163 (2nd Dist. 1994) *and citing United States Fidelity & Guaranty Co. v. Lightning Rod Mutual Ins. Co.*, 80 Ohio St.3d 584, 586 (1997)). The general principle that ambiguous language is to be construed in favor of the insured "applies with even greater force to language that purports to limit or to qualify coverage." *Watkins*, 97 Ohio App.3d at 164. Thus, "[i]f an exclusionary clause will reasonably admit of an interpretation that would preserve coverage for the insured, then as a matter of law, a court is bound to adopt the construction that favors coverage." *Id.* At the same time, if the provision limiting coverage "has only one reasonable interpretation, a court is bound to enforce the provision accordingly." *Id.* Additionally, the fact that a term is not defined does not make it ambiguous—"[t]erms that are not defined in an insurance policy 'must be given their natural

---

[5] The insurance policy also mentions Ohio law, as it includes an "Amendatory Endorsement" for Ohio, Doc. 76-1, PageID 3790. And the parties have briefed the case under Ohio law, showing their understanding that Ohio law governs the contract. *See In re Buckeye Countrymark, Inc.*, 251 B.R. 835, 839 (Bankr. S.D. Ohio 2000) ("[A]lthough the insurance contract contains no choice of law provision, the contract does mention Ohio law. . . . Further, all parties have pleaded the issues on summary judgment under Ohio law . . . . Ohio has the most significant contacts with the insurance contract at issue.").

and commonly accepted meaning.'" *Carolina Cas. Ins. Co. v. Canal Ins. Co.*, 555 Fed.Appx. 474, 477 (6th Cir. 2014) (quoting *Fed Ins. Co. v. Exec. Coach Luxury Travel, Inc.*, 2010-Ohio-6300, ¶ 3).

C. Application

The Court finds that the policy language at issue here is unambiguous. The Protective Devices Schedule and Protective Devices Endorsement together required that 3371 Reading maintain a "Fenced Jobsite" in order to receive coverage. "Fenced Jobsite" was defined to require "a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated. All gates to such fence shall be closed and locked, to secure against entry to the jobsite, during all non-working hours." Doc. 76-1, PageID 3761. Giving this contract provision its "natural and commonly accepted meaning," *see Carolina Cas. Ins. Co.*, 555 Fed. Appx. at 477, it required 3371 Reading to protect its jobsite with a construction fence. 3371 Reading contends that the brick walls of the building themselves qualify as a fence under the policy. *See* Doc. 105, PageID 5974–75. In support, it cites a Merriam Webster's dictionary definition of fence, which provides, "a barrier intended to prevent . . . intrusion or to mark a boundary." *Id.*[6] Where a contract term is susceptible of only one reasonable interpretation, however, the Court need not turn to a dictionary definition. 3371 Reading's proposed interpretation of this policy provision—whatever its consistency with one dictionary

---

[6] The full definition 3371 Reading appears to be citing provides: "a barrier intended to prevent escape or intrusion or to mark a boundary *especially* : such a barrier made of posts or wire or boards." *Fence, Merriam-Webster's*, https://www.merriam-webster.com/dictionary/fence (last accessed May 16, 2025). It bears noting that the clause following "especially" supports Liberty Mutual's argument.

definition of "fence"—is unreasonable. This provision plainly requires a separate construction fence, and the walls of a building that is under construction do not qualify as a fence.[7]

3371 Reading also makes two complaints about the language and mechanics of the protective devices schedule and protective devices endorsement. First, it argues that the Fenced Jobsite requirement does not apply to the 3371 Reading Road property, because the protective devices endorsement language was unartfully drafted. The Protective Devices Endorsement says: "If indicated on the Protective Devices Schedule, the following conditions apply to the locations described on the schedule." Doc. 76-1, PageID 3762. But, 3371 Reading points out, there aren't any locations listed on Protective Devices Schedule. Doc. 105, PageID 5970. This argument fails because 3371 Reading fails to offer a reasonable interpretation of the protective devices endorsement. Given that the policy applied to only one property, 3371 Reading Road, it is evident that the conditions in the Protective Devices Endorsement applied to that property.[8]

Next, 3371 Reading takes issue with the Protective Devices Endorsement's requirement that 3371 Reading "maintain, at all times during the policy period, the [Fenced

---

[7] *Satterlee v. Great Lakes Ins. SE*, No. 21-cv-01774, 2023 WL 3607283 (N.D. Cal. Mar. 23, 2023) supports this conclusion. That case involved an insurance policy for a boat that required that the boat be kept in a "locked and fenced enclosure." *Id.* at *1. The insured argued that the provision was ambiguous and that that it had complied with the provision because the boat was on a property protected on one side by a locked gate, the only access point to which was a "narrow walkway" on the other side. *Id.* at *3. The court rejected the argument that the insured's security provisions, which did not include a fully fenced and locked enclosure, nonetheless satisfied the terms of the policy. Thus, it granted summary judgment for the insurer. *Id.* at *5.

[8] Additionally, it is not clear that the disputed phrase, "locations described on the schedule," refers to the Protective Devices Schedule. Ohio Casualty contends that it refers instead to the Policy's Schedule of Coverages. Doc. 108, PageID 6049. Either way, the Policy, read as a whole, makes clear that the Protective Devices Endorsement applies to 3371 Reading Road.

Jobsite].” Doc. 76-1, PageID 3762. It argues that the endorsement only required that 3371 Reading *maintain* any protective device already in place; there was no fence in place when the policy went into effect, so there was nothing to maintain and 3371 Reading had no obligations under the Protective Devices Endorsement. Doc. 105, PageID 5970–71. Ohio Casualty has the better of this linguistic argument. In this context, “maintain” fairly encompasses any efforts 3371 Reading needed to take to put in place a Fenced Jobsite, as that term was defined on the Protective Devices Schedule. As Ohio Casualty points out, the verb “maintain” is frequently used this way, as when a bank advertises a savings account that requires an accountholder to “maintain” a minimum balance. Doc. 108, PageID 6050 n.4. In that context, as in the policy at issue here, the word “maintain” encompasses efforts to initially come into compliance with the requirement and subsequently remain in compliance.[9]

The nub of 3371 Reading’s argument, however, is its contention that it was impossible to comply with the Protective Devices Endorsement, so the Endorsement cannot be enforced as written. Doc. 105, PageID 5973. To repeat, the Endorsement required 3371 Reading to “maintain” the Fenced Jobsite, which the Protective Devices Schedule defined as: “a fence, not less than six (6) feet in height, that completely surrounds the jobsite, with no openings unless gated.” Doc. 76-1, PageID 3761. 3371 Reading Road abutted another building on one side and all parties agree that, as a result, it was impossible to erect a fence on that side of the jobsite. 3371 Reading argues that the Court should not interpret the Protective Devices

---

[9] Additionally, the Protective Devices Endorsement, by its terms, required 3371 Reading to “maintain, at all times during the policy period,” the Fenced Jobsite, as that term is defined in the Policy, not to maintain a fence, as 3371 Reading seems to interpret it. Thus, the verb maintain applies to the jobsite with the required protective device, not to the fence itself. This cuts in Liberty Mutual’s favor, as the policy specified that 3371 Reading was required to maintain the jobsite in a particular condition—fenced.

Endorsement in such a way that it would never be entitled to coverage under the policy, making the coverage illusory.[10] Doc. 105, PageID 5973–74.

In seeking to give effect to the intent of the parties to an insurance contract, Ohio courts avoid interpretations of insurance policies that render them illusory. *See, e.g., Talbert v. Cont'l Cas. Co.*, 2004-Ohio-2608, ¶ 36 (2nd Dist.) ("[W]e are not inclined to give the insurance policy a reading that would render it useless."). *See also Coleman v. Progressive Preferred Ins. Co.*, 2008-Ohio-3568, ¶ 13 (1st Dist.). The fact that an insured failed to comply with the terms of a policy and thus was denied coverage does not, however, mean the policy was illusory. And even when an insurance policy, read strictly literally, would entitle the insurer to deny coverage in all cases—making the policy illusory—courts reject that literal reading, because it is unlikely to be what the parties intended. For example, *Coleman v. Progressive Preferred Insurance Company* involved uninsured motorist coverage in an auto insurance policy. The policy's incidental use coverage excluded accidents that occurred while the insured was driving a vehicle that was available for the insured's "regular use" but not listed on the policy. *Coleman* at ¶ 2. The policy was drafted, however, in such a way that, grammatically, it appeared to exclude coverage whenever the insured was driving a car "furnished to" him, which would make the exclusion apply in all cases of incidental use. *Id.* at ¶ 8. Because that literal reading was evidently not what the parties intended, the court declined to interpret the policy that way. Instead, it read the provision "as it was obviously meant to read,"[11] excluding coverage for vehicles available

---

[10] *See Coleman v. Progressive Preferred Ins. Co.*, 2008-Ohio-3568, ¶ 13 (1st Dist.) ("An insurance provision is illusory when it appears to grant a benefit to the insured, though in reality it does not.").

[11] The uninsured motorist coverage at issue in *Coleman* was modeled on sample policy terms provided at Ohio Revised Code § 3937.18. This gave credence to the insurer's argument that

for the insured's regular use. *Id.* at ¶ 16. Applying that analysis, the exclusion applied, so the Ohio appellate court ruled for the insurer. *Id.* at ¶ 24.

Here, too, the Court concludes that under the best reading of the insurance policy, coverage was available to 3371 Reading if it complied with the policy's terms. Preferring an interpretation that "gives the contract vitality," *Thomas v. Am. Elec. Power Co.,* 2005-Ohio-1958, ¶ 32 (10th Dist.), the Court concludes that 3371 Reading could have complied with the Fenced Jobsite provision. Specifically, it could have put up a fence around the three sides of the building that did not abut an adjacent building. *See* Doc. 108, PageID 6052 (depicting where fence could have been constructed).

This reading is the better interpretation of the plain language of the policy. Such a three-sided fence would have "completely surround[ed]" the jobsite, *see* Doc. 76-1, PageID 3761, because there would have been no portion of the jobsite exposed to the outside world that was not protected by a fence. While it appears this reading is possibly inconsistent with the Court's rejection of 3371 Reading's argument that the brick walls of its building qualified as a "fence"—because, the argument goes, one brick wall is considered a fence but the others are not—it is not in fact inconsistent. The jobsite is identified in the policy as 3371 Reading Road, *see* Doc. 76-1, PageID 3758—not the interior of the building at 3371 Reading Road. Thus, the jobsite includes the interior and the exterior of the building. No fence was necessary on the side of the building where it abutted its neighbor, because the building was fully protected on that side by the neighbor. Were a three-sided fence to have been erected, the

_____

the coverage was not illusory, as "[s]urely, it was not the legislature's intent to specifically allow useless coverage." *Coleman* at ¶ 12. Nonetheless, the court's task was one of contract interpretation rather than statutory interpretation. The statute was only an aid in determining the parties' intent.

exterior of the jobsite would have been fully protected as required by the Protective Devices Endorsement. This reading of the Endorsement—not requiring that a fence be erected through the wall between the buildings—is how the Endorsement was "obviously meant to be read," *Coleman* at ¶ 16. It "gives . . . vitality," *Thomas* at ¶ 32, to the agreement the parties made, under which 3371 Reading agreed to install a fence around the jobsite as a condition of receiving coverage.[12]

3371 Reading insists that the insurance policy is ambiguous and any ambiguity should be interpreted in its favor. The caselaw it cites, however, in which courts construed policy language in favor of the insured, relates mostly to exclusions, where an insurer disclaims liability for a certain class of claims, rather than endorsements requiring the insured to abide by certain conditions in order to receive coverage. *See, e.g., Andersen v. Highland House Co.*, 93 Ohio St.3d 547 (2001) (holding that pollution exclusion in apartment owner's commercial insurance policy did not apply to claims arising from residential carbon monoxide poisoning). The doctrine of illusory coverage on which 3371 Reading relies is more comfortably applied

---

[12] Additionally, The Protective Devices Endorsement required 3371 Reading to notify Ohio Casualty of any "suspension or impairment" of a Protective Device listed on the Protective Devices Schedule. Doc. 76-1, PageID 3762. To the extent 3371 Reading believed it was unable to construct a fence because of the neighboring building—or for any other reason— it was required to notify Ohio Casualty of that, which it failed to do. Doc. 109-1, ¶ 36. Ohio Casualty was also entitled to refuse coverage as a result of 3371 Reading's noncompliance with this notification requirement.

3371 Reading's arguments to the contrary, Doc. 105, PageID 5972–73, are unavailing. As to Ohio Casualty's purported knowledge of impairment of the device, the policy language does not make exceptions based on the insurer's supposed knowledge of the impairment. As to 3371 Reading's argument that this only required it to notify Ohio Casualty of problems with a fence that had already been installed, its reading of the policy language is unpersuasive. To the extent 3371 Reading believed it was unable to install the required fence, this was an "impairment," Doc. 76-1, PageID 3762, of which it was required to notify Ohio Casualty.

in that domain—categorical exclusions from coverage—rather than endorsements that require the insured to satisfy certain conditions in order to receive coverage. When an insured is denied coverage based on such an endorsement, it may be inclined to argue that the insurer intended to deny coverage all along—that it could never comply with the terms of the endorsement. But it is not this Court's role to speculate as to what Ohio Casualty would have done had 3371 Reading made efforts to comply with the Protective Devices Endorsement. Where such an endorsement unambiguously requires a particular protective measure be taken, and the insured fails to take that protective measure, the insured is not in compliance with the policy and coverage may be denied on that basis. *See New Hamilton Liquor Store, Inc. v. AmGuard Insurance Co.*, No. 20-2189, 2021 WL 5974158 (6th Cir. 2021) (affirming summary judgment for insurer where insured failed to install an automatic fire alarm system, as was required by a policy endorsement).

D. Remaining Claims

3371 Reading has also brought claims for bad faith denial of coverage, Doc. 76, PageID 3747, fraud in the inducement, *id.* at PageID 3748, and violation of the Ohio Deceptive Trade Practices Act, *id.* at PageID 3750–52. Each of these claims is premised on 3371 Reading's argument that Ohio Casualty was barred by law from denying coverage under the policy. The Court has concluded that the insurance contract was valid and 3371 Reading failed to comply with its terms. Accordingly, Ohio Casualty was entitled to deny coverage. As explained in more detail below, these claims fail for that reason.

Bad Faith

3371 Reading asserts that Ohio Casualty acted in tortious bad faith by denying its insurance claim. Under Ohio law, an insurer has an obligation to act in good faith in

processing claims. Breach of that duty can give rise to a cause of action in tort against the insurer. *Hoskins v. Aetna Life Ins. Co.*, 6 Ohio St.3d 272, 276 (1983). To prevail on a bad faith claim, the insured must show: "that the insurer had (1) no lawful basis for the refusal [of the insurance claim] coupled with actual knowledge of that fact or (2) an intentional failure to determine whether there was any lawful basis for such refusal." *Waldren v. Allstate Vehicle and Prop. Ins. Co.*, No. 3:18-cv-290, 2020 WL 5214608 at *5 (S.D. Ohio Sept. 1, 2020) (internal quotation marks and citation omitted). Because there was a lawful basis for Ohio Casualty to deny coverage, 3371 Reading cannot prevail on its claim for bad faith refusal. Ohio Casualty is entitled to summary judgment on this claim.

<u>Fraudulent Inducement</u>

3371 Reading also brings a claim for fraudulent inducement against Ohio Casualty, asserting that it made material misrepresentations to 3371 Reading while negotiating the Policy. Doc. 76, PageID 3748. Plaintiff identifies eight purported misrepresentations made by Ohio Casualty, each of which is a statement in the Policy itself. *Id.* at PageID 3748–49.[13] The statements in the Policy that 3371 Reading cites are the terms of the policy under which it later denied coverage, but as the Court has explained, coverage was properly denied based on 3371 Reading's failure to comply with the terms of the policy. Accordingly, none of the statements Plaintiff identifies, which promised that coverage would be provided according to

---

[13] The typical fraudulent inducement claim, by contrast, "asserts that a misrepresentation of facts outside the contract or other wrongful conduct induced a party to enter into the contract." *ABM Farms, Inc. v. Woods*, 81 Ohio St.3d 498, 503 (1998).

the Policy's terms, were false, so no fraud was committed on 3371 Reading. Ohio Casualty is likewise entitled to summary judgment on this claim.[14]

Ohio Deceptive Trade Practices Act

3371 Reading also brings claims against Ohio Casualty for violations of the Ohio Deceptive Trade Practices Act, Ohio R.C. 4165.01, *et seq.* (ODTPA), alleging that Ohio Casualty "deceptively s[old] insurance policies that provide no coverage." Doc. 76, ¶ 77. More specifically, 3371 Reading claims that Ohio Casualty represented that the Policy it sold to 3371 Reading had "characteristics, . . . uses [or] benefits" that it did not have, because it represented that the Policy provided fire and theft coverage when the Policy "would never, according to [Ohio Casualty's] interpretation, ever provide such coverage. *Id.*, ¶ 73 (quoting Ohio R.C. 4165.02(7)).

In order to succeed on an ODTPA claim, a plaintiff must prove: "(1) a false statement or statement that is misleading, (2) which statement actually deceived or has the tendency to deceive a substantial segment of the target audience, (3) the deception is material in that it is likely to influence a purchasing decision, and (4) the plaintiff has been or is likely to be injured as a result." *Torrance v. Rom*, 2020-Ohio-3971, ¶ 48 (8th Dist.)

3371 Reading's ODTPA claim fails to satisfy the first requirement because there was no false statement. The claim relies on 3371 Reading's assertion that the coverage was illusory—that Ohio Casualty would never have provided coverage in any circumstances—but

---

[14] 3371 Reading does not claim that it intended to procure insurance without a fencing requirement and that Ohio Casualty misled it by failing to mention that requirement. Such a claim, too, would likely be unavailing absent misrepresentations outside the contract, as "[t]he law does not require that each aspect of a contract be explained orally to a party prior to signing." *ABM Farms*, 81 Ohio St.3d at 503.

the Court has rejected this argument for the reasons set out above. Instead, the terms of 3371 Reading's insurance contract with Ohio Casualty required it to put up a protective fence around the building; 3371 Reading failed to satisfy that requirement, so Ohio Casualty denied coverage. Thus, Ohio Casualty made no misrepresentation upon which an ODTPA claim could be grounded. 3371 Reading fails to raise a genuine issue of material fact as to the validity of its ODTPA claim, and Ohio Casualty is entitled to summary judgment.

## IV.  CONCLUSION

The terms of 3371 Reading's Policy required it to put up a fence around its property. 3371 Reading does not dispute that it never did so. As a result, Ohio Casualty was within its rights to deny coverage.

In reaching this conclusion, the Court has not relied on any expert testimony proffered by the parties, including the two experts challenged by 3371 Reading (Docs. 103, 104), as the Court has concluded that expert testimony is not helpful in determining the meaning of the Policy terms. Nor has the Court relied on Defendants' Supplemental Response to Plaintiff's Motion for Summary Judgment (Doc. 112), as this response relates primarily to issues the Court did not need to reach in disposing of the case.

Accordingly, the Court **GRANTS** Defendants' Motion for Summary Judgment (Doc. 99), and **DENIES** Plaintiff's Motion for Partial Summary Judgment (Doc. 105). Plaintiff's Motions to Exclude (Docs. 103, 104) are **DENIED AS MOOT**. Defendants' Motion for Leave to File Supplemental Response (Doc. 112) is also **DENIED AS MOOT**.

The Court **ORDERS** the clerk to **ENTER JUDGMENT** for Defendants and **TERMINATE** this matter from the docket.

**IT IS SO ORDERED.**

May 16, 2025

Jeffery P. Hopkins
United States District Judge